No. 93,168

STATE OF KANSAS, *Appellee*, v. JACK LESLIE HARNED, *Appellant*.
(135 P.3d 1169)

Opinion filed June 9, 2006.

*Russ Roe*, of Cami R. Baker & Associates, P.A., of El Dorado, was on the brief for appellant.

*Darrin C. Devinney*, assistant county attorney, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Jack Leslie Harned entered a no contest plea to one count of first-degree felony murder in the death of Cheryl Dianne Romero. Before sentencing he moved to withdraw his plea, claiming he misunderstood the applicable penalty and entered his plea because he thought his attorney was not ready for trial. After a full hearing, the trial court denied his motion and sentenced the defendant to life in prison with parole eligibility after 20 years. The defendant appeals. We affirm.

FACTS

In January 2003, Romero and Harned were living together at Romero's rural farm in Butler County, Kansas. Romero ran a horse training operation on her farm.

On January 27, 2003, Romero went to an eyeglasses shop in Wichita at 3 p.m. to have her eyeglasses repaired. The next day, Mike Griswold, who had been shoeing Romero's horses for 10 years, arrived at the farm for his regular weekly appointment. Romero was not there, which was unusual. Harned told Griswold that Romero had not returned since leaving the day before to have her eyeglasses repaired in Wichita. Griswold asked Harned if he had reported her as missing. Harned said he had not. Griswold told him to call 911 immediately. Harned then contacted the police and reported Romero missing.

A Butler County Sheriff's officer went to Romero's home that day to take a missing person's report. Harned told him that he and Romero had lived together for 4 years, and he identified himself as her "[c]ommon-law husband." He told the officer that Romero left the house at 11 a.m. the day before to go to Wichita to have her glasses repaired. He said she never returned. He also said she had taken $500 in cash with her when she left and that the repair of the glasses was going to cost around $300.

The officer obtained Romero's descriptive information, and Harned told him that Romero was driving a 2001 white Dodge dually

pickup truck. He also told the officer that she would frequently visit Wal-Mart, the grocery store, or the feed store.

That afternoon, Romero's son and daughter found her pickup in the parking lot of the Wal-Mart on East Kellogg in Wichita. Wichita police confirmed the vehicle belonged to Romero, and they impounded the truck.

Later that same afternoon, Tom and Carmen Miller were walking on Boyer Road, which was near Romero's residence. They saw an object in the roadway that looked like a ham, but they did not examine it closely. The next morning, January 29, 2003, the Millers were once again on Boyer Road in the area where they had seen the object that looked like a ham. In a roadside culvert, Carmen Miller saw what she thought was the body of an animal. On closer examination, it appeared to be a human body. She then looked more closely at the ham-like object and saw that it appeared to be a human head.

Investigators arrived at the scene. They found the burned remains of a human torso on the east side of the road near a low water bridge, burned extremities on the west side of the road, and just north on the road they found a burned human head. The remains were later identified as Romero. The autopsy revealed that she had suffered multiple injuries, including two broken mandibles and broken ribs.

Officers found a bed sheet with a floral print near the extremities. Nearby, there was an upside-down metal stock tank sitting in a brush pile from under which fire debris was recovered and some Schneider Grain and Feed grain sacks that had been folded and placed in a drain pipe near the body parts.

A K-9 certified in accelerant detection was brought to the scene. The dog indicated the presence of an accelerant on the bed sheet, on the clothing that was found on the torso and the extremities, and in the fire debris that had been under the stock tank. At Romero's residence, the K-9 alerted for the presence of accelerant on a clear jug and two fuel cans in the barn. The presence of accelerant was also found on two swabs taken from the bed of Romero's pickup truck. Later, Harned's boots testified positive for the presence of gasoline.

Officers executed a search warrant at Romero's home on January 30, 2003. Inside the house, officers found a bed sheet covering a recliner that matched the color and pattern of the bed sheet that had been found with the body parts. They also found burned remnants of Schneider Grain and Feed grain sacks between the house and the horse barn. A wood saw recovered from the barn was later determined by forensics to match a cut on Romero's right shoulder blade.

In the master bedroom, officers found a pair of boxer shorts with a spatter of blood on them. DNA tests on the boxer shorts showed the blood was Romero's. Additionally, DNA from both Romero and Harned was found on the waistband of the boxer shorts, as well as a urine stain that was determined to be from Romero.

In the course of the investigation, officers obtained security tapes from the Wal-Mart on Kellogg. The tape showed Romero's truck arriving in the parking lot at 8:20 p.m. on January 27 and an individual matching Harned's description getting picked up by a taxi cab near the general merchandise doors at approximately 9:50 p.m. that same day.

The ABC Taxi Cab Company confirmed that they received a call to pick up a man named Jack at the Wal-Mart on Kellogg at 9:41 p.m. Taxi driver Luis Figueroa picked up a man from Wal-Mart that night and drove him out to a rural area between Augusta and Douglas. Butler County Sheriff's Department Detective Kelly Herzet had Figueroa pick him up at the Wal-Mart on Kellogg and take him along the same route and to the same destination as he did for the man named Jack on January 27. The destination Figueroa took the detective to was Romero's residence.

Harned was charged with one count of second-degree murder, in violation of K.S.A. 21-3402(a), a severity level 1 person felony.

At the preliminary hearing, the defense moved to block evidence about Harned's and Romero's relationship problems. The court allowed the testimony. Romero's friend Raymond Leroy Ivie testified that in 2001, Romero had a black eye and bruises on her face and that she had told him Harned had beaten her. She also told Ivie that Harned had broken into the house and had made threat-

ening phone calls. She asked Ivie if she could borrow a gun from him because she was scared of Harned.

Romero's friend Mary Silvey testified that she was aware in November 2002 that Romero was unhappy with Harned's behavior and wanted him to move out and get out of her life; however, she was afraid of what he might do to her if she told him that.

The defendant was bound over on the charge of second-degree murder. After at least one continuance, Harned's jury trial was set to begin March 9, 2004. However, on March 8, 2004, the matter came before the court for a plea hearing.

At that hearing, Harned's attorney announced that, pursuant to plea negotiations, Harned would enter a plea of no contest to first-degree murder. Harned's counsel told the court that he had met with Harned quite a bit in preparing the case for trial and had discussed with him the possible sentences he could receive in the event of a guilty verdict. He explained that by pleading guilty to the higher charge of first-degree murder, Harned would at least be parole eligible after 20 years; whereas, if Harned were convicted of second-degree murder, with his prior criminal history under Kansas Sentencing Guidelines, he would be facing a 51-year sentence which would require that he serve no less than 43 years in the event he earned all possible good time credits.

A written Acknowledgment of Rights and Entry of Plea form was completed and signed by Harned. The written plea agreement mirrored defense counsel's statement of the agreement and the purpose behind it:

> "2. Plea negotiations have been conducted with my consent . . . , to the crime of MURDER IN THE FIRST DEGREE, an off-grid person felony, to take advantage of the possibility for parole after a period of twenty years. The State will not seek the imposition of a mandatory fifty year prison sentence. The mandatory minimum term will be 20 years before parole eligibility."

In that document, Harned acknowledged that he understood the charge to which he was entering a plea carried a sentence of imprisonment for life with parole eligibility after serving 20 years without any good time credit and further, that he understood that

he may never be granted parole and, thus, may be required to serve the entire life sentence:

"I understand from discussions with my attorney, and have been advised by the Court, that the following are the range of sentences and fines which may be imposed against me by the Court if I choose to enter a plea of guilty or nolo contendere (no contest) to the criminal charge pending against me.

"Count 1: Imprisonment for life and a fine not to exceed $500,000.00

"I understand I will be eligible for parole after serving 20 years of confinement without any good time credits, and that I may be required to serve the entirety of my life sentence and never be granted parole from the sentence."

The State presented the court with an amended information, changing the second-degree murder charge to first-degree premeditated murder:

"[Prosecutor]: Your Honor, I have drafted an amended information changing count one, murder in the second degree to that of murder in the first degree, adding as well as . . . the specific language . . . that in Butler County, Kansas on or about the 27th day of January 2003, Jack Leslie Harned, with premeditation killed a human being, one Sheryl [sic] Dianne Romero. The crime of murder contrary to K.S.A. 21-3401(a), an off grid person felony. That is presented, although not yet filed with the clerk's office."

The defense had no objection to the State amending the charge. The trial court asked Harned whether he was aware the charge had been amended upward to first-degree murder, and he replied that he was. The trial court then asked the defendant how he wished to plead to that charge, and the defendant replied, "No contest." The judge then inquired of the defendant concerning his understanding of the process and the consequences of entering the plea:

"THE COURT: All right. Let me go over a few things with you, Mr. Harned. I know that you have had extensive talks with your attorney. I heard that he was out there at the jail very early today and this kind of thing. But in any event I want to make sure that—that you know exactly what—what you are doing; that you understand fully what your rights are given the nature of what it is that you're pleading guilty to, especially now that it's been amended upward to first degree murder. As I understand it, you are 46; is that correct?

"THE DEFENDANT: Yes, sir.

"THE COURT: And you have your GED. So you basically have a high school education; is that correct?

"THE DEFENDANT: Yes.

"THE COURT: All right. Now, due to some of the things that the attorneys have told me here and what I recall from some of our previous hearings, I know that you have had some previous experience with the court or with the courts and [are] probably pretty well acquainted with how things run. And I want to go over that a little bit with you. As I recall there was a homicide case out in Arizona and that you had been involved in that; is that correct?

"THE DEFENDANT: No, sir.

"THE COURT: No. It—all right. Tell me about that thing?

"THE DEFENDANT: That was on a robbery and aggravated assault.

"THE COURT: That's right. That's right. And it involved a guard or something?

"THE DEFENDANT: Yeah.

"THE COURT: I think. Anyway, you were convicted and went through some kind of a trial there; is that correct?

"THE DEFENDANT: No. I went—took a—took a plea bargain.

"THE COURT: Okay. And you spent time in prison as a result of that?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. So you have been through, at least in that case, the criminal process and are acquainted with things like plea—pleas and negotiations and one thing or another; is that correct?

"THE DEFENDANT: Yes, sir.

"THE COURT: Okay. So what we're doing today isn't necessarily brand new to you or something that is strange or unusual, is what I'm getting at, I guess. Would that be a fair statement, that you do basically understand what we're doing here today and have had some experience with the law?

"THE DEFENDANT: Yes, sir.

"THE COURT: Okay. All right. Now, there are several things that I want to especially make sure that we go over and that is—I have in front of me a document that's called the Defendant's Acknowledgment of Rights and Entry of a Plea. And that is about an eight page document and I note that you have signed that document today. Did you have an opportunity to go over this acknowledgment of your rights and your entry of a plea thoroughly with your attorney before you . . . signed it?

"THE DEFENDANT: Yes, sir.

"THE COURT: In going over that with your attorney, [were] there any questions that might have arisen that you were not sure about or that you would like to ask me about or have some further discussion on with your attorney?

"THE DEFENDANT: No.

"THE COURT: All right. Apparently you believe that under the way we classify crimes in Kansas that you would be what we call a criminal history score of B, which means that you had two prior person felonies, one of which was, I think, the one you just described. Perhaps there was another one connected with that case also. I can't remember.

"THE DEFENDANT: It was all one.

"[DEFENSE COUNSEL]: Two charges, one case, Judge.

. . . .

"THE COURT: All right. Now, with your plea to the amended count one of first degree murder, this is what we call an off grid sentence. We don't use that little grid that we have probably discussed in the past and you have looked at with your attorney and this kind of thing. Basically first degree murder carries a sentence of imprisonment for life and a fine not to exceed $500,000.00. Do you understand that?

"THE DEFENDANT: Yes, sir.

"THE COURT: Okay. I think that in going over with your attorney, did you not calculate with him what kind of sentence you might get as a result of a conviction by the jury of second degree murder? Did you go over that on a little grid with him?

"THE DEFENDANT: Yes, I did.

"THE COURT: Okay. And do you recall how many months of imprisonment you would have received under that grid had you been convicted by a jury?

"[DEFENSE COUNSEL]: Judge, I broke it down to years, as opposed to months.

"THE COURT: Okay. All right.

"[DEFENSE COUNSEL]: It would have been 51 years.

"THE COURT: Okay. All right. Is that your understanding of what could [have] happened or had you gone to trial and been convicted of second degree murder?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. Okay. Now, the way it stands—I don't want to call it a quirk in the sentencing procedures—but it's just the way this happens to shake out in your unique set of circumstances, considering your prior criminal history and considering what the penalty is for first degree murder in Kansas. You would be eligible for parole after serving 20 years. You don't get any good time credit on the first degree murder. But that the sentence would be life imprisonment and after 20 years you would be eligible for parole. Do you understand that?

"THE DEFENDANT: Yeah.

"THE COURT: Okay. I want to emphasi[ze] one thing with you that doesn't automatically mean after that 20 years you would just be out. That means that you start seeing the parole board. They might grant you probation or they might let you—they might keep you in a while. That's nothing I have any control over or anything else here. A lot of that may have to do with like say your conduct in prison, that kind of thing. It's nothing I have any authority over one way or the other. It's entirely up to the parole board as to when, if ever, you should be released after that 20 year period has expired. Do you understand that?

"THE DEFENDANT: Yeah.

"THE COURT: Okay. I think I mentioned that there is no good time credit on first degree murder. So it would be a situation of 20 years before you could start seeing the parole board. You don't earn good time on a first degree murder. Do you understand that?

"THE DEFENDANT: Yeah."

The trial court next informed the defendant that by entering a plea he would be giving up his right to a jury trial. The court told the defendant that the trial had not been called off; it could still begin the next day and it had a jury ready to come in if that was what the defendant wanted.

The court then went into detail explaining each of the constitutional rights the defendant would be giving up by entering a plea. Each time the court asked if he understood the rights he was waiving, the defendant replied that he did.

The trial court then asked the defendant if he felt he had enough time to discuss this with his attorney:

"THE COURT: Okay. Do you feel you have had plenty of time to discuss this with your attorney and with your family about how you want to handle and proceed with your case now?

"THE DEFENDANT: I don't think I had enough time but—

"THE COURT: I know there's never enough time.

"THE DEFENDANT: No, there isn't.

"THE COURT: If you would like to have a bit more time to discuss this with your attorney or something like that, I would certainly give you a right to do that. I'm not talking about days and days and days, but I don't want you to feel that— that I'm rushing you or that you have been stampeded or something by this.

"[DEFENSE COUNSEL]: I think we are ready to proceed, Judge.

"THE COURT: You feel that you have had an appropriate amount of time to decide how you want to handle it?

"THE DEFENDANT: Yeah."

The trial court then asked the defendant whether the plea was being made voluntarily and of his own free will, and the defendant replied that it was. The defendant further affirmed that nobody had threatened him, made unusual promises to him, or told him that the judge would go easier on him or anything like that if he would enter a plea. The defendant also affirmed that he was not under the influence of intoxicating liquor or drugs, was not suffering from mental pressures or anything that was interfering with his ability to understand what he was doing, and that he had never been declared mentally ill or under the care of a guardian or conservator.

The court then had the State present the factual basis for the charges. The State presented a lengthy factual basis that included the evidence it would have presented to prove the element of premeditation.

As soon as the State was finished with the factual basis, defense counsel asked to have a couple minutes with his client. A recess was then taken that lasted 50 minutes. When they returned, defense counsel informed the trial court that the State would be amending the charge from first-degree premeditated murder to first-degree felony murder and providing an additional factual basis:

"THE COURT: Okay. All right. Let's go back on the record. After that short recess, counsel might update the Court here on what we are doing. I think we need to make a couple of corrections; is that right?

"[DEFENSE COUNSEL]: That is correct, Your Honor. At this time, it is my understanding by agreement that the charge itself would be amended again to first degree felony murder under the statute, rather than first degree premeditated and all the same facts, I think, the State has already presented, with maybe a short additional fact. But the Court's already heard most everything. We are asking the Court to make that amendment.

"THE COURT: Okay. Mr. Harned, I know you and Mr. Patterson have been discussing this here for the last few minutes and I think also maybe you have talked to your mom and this kind of thing. Are you following along on what—why we need to make this amendment here to make this thing work?

"THE DEFENDANT: Yeah.

"THE COURT: All right. And you're—is there anything that you would like— that you and I have talked about or anything about this change that you want to ask me about or would make you change your mind about how you want to plea?

"THE DEFENDANT: No.

"THE COURT: All right. Okay. Mr. Devinney, I take it you are going to make an amendment?

"[THE PROSECUTOR]: I will, Your Honor, and I think that what Mr. Patterson outlined is sufficient. Just so we are clear, the amended information will read, murder in the first degree, but then pursuant to subsection (b)(2), as opposed to (b)(1) as previously noted on the record, (b)(2) is the felony murder application for [first-degree] felony murder, an inherently dangerous felony as to be underlying or linked to the crime. And that pursuant to 22—I'm sorry—21-3436, which lists out the inherently dangerous felonies under subsection (a)(3) of that statute lists the crime of robbery, which is a violation of 21-3426.

"Crime of robbery, lines out this is the taking of property from the person or presence of another by force or by threat of bodily harm to any person. It is listed

as a severity level 5 person felony. While Mr. Harned has not been charged separately with robbery, we are using the underlying elements of robbery here today to prove the inherently dangerous underlying felony for the felony murder, as opposed to murder in the first degree. The additional facts pursuant to the Alford plea is a statement that Mr. Harned made to law enforcement on January 29, 2003, which included that Dianne Romero left the home with $500.00 in cash. That she returned home at some point with the facts we have already discussed with the Court. And that when he was arrested, in his personal possession he had $330.00 in cash.

"The State would show that $50.00 of that was used to pay for a cab ride. So a total of $380.00 in cash that he had. It was abnormal for him to have that type of money in his pocket. Therefore, that he had—at least the State would present evidence to allege that Mr. Harned—that he had taken this cash from Dianne Romero in the form of a robbery.

"THE COURT: And that is your underlying felony for the felony murder?

"[THE PROSECUTOR]: Yes, Your Honor. One of the enumerated inherently dangerous felonies, which is applicable for felony murder purposes.

"THE COURT: Very well. Okay. Mr. Harned, I realize we have been here quite a while today. It's stressful and for all of us. We are taking quite a while to put this together, but keeping in mind the matters that we have all—you and I have discussed concerning your rights and after conferring with your attorney and further conferring after the change was made to the felony murder, is it still your wish to plead no contest to the felony murder charge?

"THE DEFENDANT: Yes, sir."

The court then found the plea to be knowingly and voluntarily made with an understanding of the penalty and that there was a sufficient factual basis to support the charge of felony murder. The court accepted the plea but failed to make a finding of guilt. The State informed the court that it would be filing the amended charge the next day. An amended information was filed March 13, 2004.

Before sentencing, the defendant filed a pro se motion to fire court-appointed counsel, contending that his attorney had not been truthful with him, had not visited him enough, and was ineffective. The defendant's counsel moved to withdraw, and new counsel was appointed for the defendant.

The defendant's new attorney then filed a motion to withdraw the plea. In his motion, the defendant contended that the plea should be withdrawn because it was not made with a correct understanding of the applicable sentence and was not voluntary. Specifically, the defendant contended that he believed the sentence

was 20 years and that he "entered the plea with the understanding that the sentence recommended and the sentence imposed by the Court would be 20 years." Only after entering his plea did he realize that the applicable sentence was "a minimum of 20 years and a maximum of life." Finally, the defendant contended that he was motivated to enter the plea because he believed his attorney was not prepared for trial.

At the evidentiary hearing held on the motion, the defendant and his former attorney testified. The defendant testified that he misunderstood the sentence he would receive. He testified that he thought his sentence would be 20 years and that he would have to do 17 years before he would see the parole board. He testified that "nothing was ever said about a life sentence."

He testified he also wanted to withdraw his plea because of his state of mind at the time of the plea. He did not feel he had a lot of time to think about the plea and he wanted to go to trial. He asked his lawyer to request a continuance, but his lawyer said there was no way that would happen. He testified he asked his lawyer to stop the proceedings. They then went out into the hall and he told his lawyer he wanted to go to trial. However, when the proceedings resumed, his lawyer did not make that announcement. He went on and finished the plea because he felt like he had no choice because he wanted to do one thing and his lawyer was telling him to do another. The defendant testified he did not know that he could have addressed the judge directly about the issue.

The defendant also testified that he did not think his case was ready to go to trial. According to the defendant, until 2 days before the trial in March, he had not seen his lawyer since early December. He had no idea how his lawyer was going to defend him. The defendant testified that he did not believe he could get a fair trial because his attorney was not prepared. He also expressed some concern about his lawyer's changing opinion on the strength of the case against him. He said that his lawyer had told him that they had no evidence against him other than hearsay and circumstantial evidence, but then, 2 days before trial, his attorney told him that he had no chance, so he better take the plea bargain.

On cross-examination, the defendant was asked about the written plea form he had signed. The defendant testified he did not read the whole thing and was going by what his lawyer was telling him. He admitted that he responded "yes" to the judge's question about whether his plea was freely and voluntarily given, but said he "didn't want to say that." The defendant was also asked about his understanding of the sentence:

"Q. [PROSECUTOR] And do you recall the Court on that date asking you if you understood that this was a life sentence to the crime to which you were pleading?
"A. [THE DEFENDANT] No. No, I didn't understand.
"Q. You don't recall any of that?
"A. Well, I don't—him—him telling me it was a life sentence, not until when I come in here. Until the Judge said something about if—
"Q. Was this after your break with Mr. Patterson?
"A. That was before. The first time I heard about a life sentence was in here.
"Q. Okay. So at the plea hearing, the Judge mentioned it was a life sentence and that was before you took the break with Mr. Patterson in the hallway?
"A. Yeah. And then you got up and said what you said. That's when I told my lawyer that I wanted to stop. I wanted to go to trial.
"Q. And after the break do you recall the Judge informing you again about it was a life sentence?
"A. I'm not—I know—I'm not sure what—exactly what time he did—he told me that. But I know when you said that, that's it. I told my lawyer I wanted to go to trial after that and some things were said."

The defendant's former attorney testified that he and the defendant first discussed the possibility of a plea bargain in June 2003. He had written the defendant a letter suggesting that he consider some of the items of evidence that the State was going to present against him and that he would then come to the jail to talk about it. During that meeting, he discussed with the defendant his criminal history and the possible penalties he faced for a second-degree murder conviction. With his criminal history, if he was convicted of second-degree murder, the defendant would essentially get a life sentence. He explained to the defendant that the penalty for first-degree murder was 20 years to life and suggested that he consider entering a plea to first-degree murder because of the possibility of parole after 20 years. The defendant said he wanted to go to trial. After that, the subject did not come up again until right before trial.

The weekend before the trial was to begin, he met with the defendant at the jail on Saturday and Sunday for last-minute preparations. He testified that he was prepared for trial and was going over each witness with the defendant to see if there was anything else he could think of to help with his cross-examinations. Because it was the last time he would see Harned before the trial, that Sunday he suggested to the defendant that he think about the plea they had discussed back in June. The defendant teared up and asked him to call his parents and have them come in the next day so he could talk with them about it.

Harned's attorney testified that on the day of the plea he strongly suggested to the defendant that he accept the plea. He also testified that at the time, the defendant had a lot of concerns, was under a lot of pressure and stress, and that he wavered back and forth. He testified there were several times during the proceedings in which the defendant told him he wanted to go to trial. The defendant also asked him at one point if he could request a continuance. He told the defendant he did not think that would be possible. He did not request a continuance because he believed it would be futile.

The defendant's attorney also testified about the long recess. He testified that there had been a misunderstanding between himself and the prosecutor regarding the statutes and the penalties. Jan Satterfield (the county attorney) was in the courtroom at one point during the plea and brought to their attention the fact that the penalty for first-degree premeditated murder was 25 years to life, not 20 years to life. The defendant's attorney had a quiet conversation with the defendant about this at counsel table, and the defendant indicated that 25 years was a "deal breaker." Because the plea agreement was based on a penalty of 20 years to life, they had to correct the charge. The defense attorney, the prosecutor, and the county attorney went back into a conference room and discussed the matter. Defense counsel told them that 25 years was a deal breaker. That is when they decided to change the charge to first-degree felony murder in order to get a sentence of 20 years to life.

The defendant's former attorney testified that during that recess, Harned said he wanted to go to trial. He continued to strongly

suggest to the defendant that he enter the plea, but toward the end of the conversation he told the defendant, " '[L]et's go tell the Judge we want a trial.' " The defendant then said, " 'No.' " The defendant talked with his mother, and she asked him to go ahead and do the plea. The defendant then said, " '[L]et's go in and finish [the plea].' "

The defendant's former attorney was questioned about what he had told the defendant about the penalty. He denied that he told the defendant that he would be parole eligible at 17-18 years, stating that such a thing was not possible under the statute. He testified that he had talked with the defendant several times about the penalty, telling him it was 20 years to life. Further, he pointed out that the 20 years to life penalty was set out in the plea form and noted that the judge had brought it up during the plea hearing as well.

With respect to the written plea agreement, the defendant's former attorney testified that he read the plea form along with the defendant and explained each part as they went through it.

He also testified he was prepared for trial and had been prepared since December, when the trial was originally set. He explained that he had requested a continuance of the December setting because there was an essential witness that had moved out of state. He testified that he met with the defendant before and after hearings, and had met with him at the jail six to seven times.

The court denied the motion to withdraw the plea, concluding that the defendant had failed to show good cause for withdrawal of the plea. The court stated that the plea hearing was one of the most extensive plea hearings it had conducted in quite some time. In support of its ruling, the court went through the transcript in detail. The court explained that many of the questions it asked during the plea process were designed not only for the answers, but also to allow the court to watch the defendant's body language to determine whether it was the defendant's true and voluntary choice to enter a plea.

The judge also explained he asked questions designed

"to detect whether or not a person has had appropriate legal representation . . . [and] to lead the defendant into a situation where he feels he can say to me, no, something has happened here. I need to—I need some time, Judge. I

need to talk about this some more, there are some things that I'm not understanding. I—I want to talk to my lawyer a little bit longer."

The court then went page by page through the transcript of the colloquy it had with the defendant during the plea hearing. The court pointed out that it had asked the defendant about his age and education level to determine whether he was intelligent and able to understand what he was doing. He asked about his prior criminal cases in Arizona to evaluate whether he was familiar with court processes.

The judge went over that part of the plea process where he asked he defendant about the written Acknowledgment of Rights and Entry of Plea:

"And I asked you if you had an opportunity to go over that with your attorney and . . . [y]ou told me, yes, that you did.

"And then I asked you a question that was designed to give you a little bit of an out there. Were there any questions that might have arisen that you weren't sure about or that you would like to ask me or have some further discussions with your attorney? I was—once again, I was giving you a little bit of an opportunity to say, wait a minute, stop, I want to—I need to talk—I need to talk to you, Judge. I need to talk. I need to talk to someone. I'm not quite understanding this."

The judge reviewed the possible penalty for the charge to which the defendant was entering a plea:

"And then we talked about—and I said basically first degree murder carries a sentence of imprisonment for life and a fine not to exceed $500,000.00. Do you understand that? You said, yes, you did.

"And then I asked you if you calculated with your attorney the kind of sentence that you might get as a result of that second degree murder conviction? And you said, yes, you did. You had gone over the grid with him. And do you recall how many months that you would get? Mr. Patterson spoke up, well, I broke it down in years for him. And that would be 51 years.

"And so then I asked you if you understood that's what it—what could have happened had you gone to trial and been convicted of that? You said, yes, you did. And then I talked to you about the new sentence procedures and this quirk was allowing you to plead guilty to first degree and come out differently and with a better deal, if you want to call it that, than with the second degree. And I said considering your prior criminal history and considering what the penalty is for first degree murder in Kansas, you would be eligible for parole after serving 20 years. And I said you don't get good time credit on the first degree murder.

"This is important because we talked about that during your testimony, what your understanding was of what your attorney had told you. And I said, the sen-

tence would be life imprisonment and after 20 years you would be eligible for parole. Do you understand that? And you said, yes. Then I said, okay, I want to emphasi[ze] one thing, that doesn't automatically mean after 20 years you would be out; that means you start seeing the parole board. They might give you probation, they might not. I don't have any authority over that one way or another. It's entirely up to the parole board as to when, if ever, if ever, you would be released after that 20 year period has expired. Do you understand that? And you told me that you did.

"Then I told you there was no good time credit on first degree murder. And so you would have—it would be a situation of 20 years before you could start seeing the parole board. You don't earn good time credit on a first degree murder. Do you understand that? And you told me you did."

The judge also discussed that part of the proceedings in which he asked the defendant if he had enough time to discuss the matter with his attorney:

"Then later there was one little safety value question that I asked, mainly just to make sure—give them another opportunity if they need it. Okay.

"Now, do you feel that you have had plenty of time to discuss with your attorney and with your family—and with your family, because I remember what the situation was for you and—and that your folks were here, that it was a situation—and I added that, with your family, about how you wanted to handle and proceed with your case. And you said, if you remember, well, you know, I don't think I have had enough time. I said, I know there's never enough time. And you said, no, there isn't.

"And so I said to you if you would like to have a little bit more time to discuss this with your attorney, I would certainly give you that right to do that. I'm not talking about days and days. But I don't want you to feel that I'm rushing you or that you are stampeded or anything like this. Mr. Patterson, then said, I think we are ready to proceed, Judge.

"And I said, you feel that you have had an appropriate amount of time to decide how you want to handle it? You told me, yes. So then I asked about whether or not your plea was voluntary and of your own free will? Had anybody threatened you? You said that you weren't."

The court noted that after the State provided the factual basis for the charge, that the defendant seemed upset, and a request was made for a brief recess. The court stated that after the recess, it was brought to the court's attention that the plea was proceeding under the wrong first-degree murder statute section, which would have resulted in a 25-year to life sentence. The judge then noted

the discussions he had with the defendant in light of the corrections that were being made to the charge:

"But I said to you, okay, Mr. Harned, I know you and Mr. Patterson have been discussing this for the last few minutes. I think also you talked to your mom. Are you following along here with what we need to do to make this amendment work? And you said, yes.

"So then I gave you another little out. So is there anything you would like to—that you and I have talked about that you want to ask me about, or make—would make you change your mind about how you wanted to plea after they made the amendment to get that down to the 20 years? You said, no.

"And then Mr. Devinney went ahead and made the formal amendments, so we could make the 20 year thing work. And then once again towards the end, I said, very well, Mr. Harned, I realize that we have been here quite a while today. It's stressful—it's stressful for all of us. We're taking a while—quite a while to put this together, but keeping in mind the matters that we have all—that you and I have discussed concerning your rights and after conferring with your attorney and further conferring after the change was made to the felony murder, is it still your wish to plead no contest to the felony murder charge? You said, yes, sir."

The court explained that it had carefully observed the defendant that day, and in order to accept the allegations, it would have to conclude that the defendant was consistently untruthful throughout that entire plea hearing. The court found that was not the case.

The court next addressed the allegations concerning defense counsel and found "there was no significant evidence that's been shown here today that counsel was unprepared for trial." The court found that defense counsel was experienced in handling murder cases, and had prepared for the trial. The court noted that defense counsel had hired a private investigator, had prepared a witness list that he went over with the investigator and the defendant, had exhibits, had successfully defended a motion to admit the evidence of the Arizona convictions under K.S.A. 60-455, had conducted a full preliminary hearing, and had filed, prepared, and argued a motion to suppress.

After the motion was denied, the case proceeded to sentencing. The defendant was sentenced to life imprisonment with the possibility of parole after 20 years.

DISCUSSION

## THE DEFENDANT ARGUES THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING HIS MOTION TO WITHDRAW HIS PLEA.

The parties do not dispute the standard of review that applies to an appeal of a trial court's denial of a motion to withdraw a plea. "The decision to deny a motion to withdraw a plea lies within the sound discretion of the trial court, and the court's decision will not be disturbed on appeal absent a showing that the court abused that discretion." *State v. Bey*, 270 Kan. 544, Syl. ¶ 3, 17 P.3d 322 (2001). Discretion is abused when no reasonable person would agree with the trial court. The defendant bears the burden of establishing abuse of discretion. 270 Kan. at 546.

K.S.A. 2005 Supp. 22-3210(d) provides the standard for allowing withdrawal of a plea:

"(d) A plea of guilty or *nolo contendere*, for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged. To correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea."

The motion to withdraw the plea was made before sentencing and, therefore, the good cause standard under K.S.A. 2005 Supp. 22-3210(d) applies.

In evaluating whether good cause has been shown for a plea withdrawal, the trial court should consider whether " '(1) the defendant was represented by competent counsel, (2) the defendant was misled, coerced, mistreated, or unfairly taken advantage of, and (3) the plea was fairly and understandingly made. [Citation omitted.]' " *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006) (quoting *Bey*, 270 Kan. at 545). To be constitutionally valid, guilty pleas " 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' " *Edgar*, 281 Kan. at 36-37 (quoting *Brady v. United States*, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 90 S. Ct. 1463 [1975]).

1. *Claims abandoned on appeal.*

Before the trial court, the defendant argued his plea was not made with an understanding of the consequences because he misunderstood the applicable penalty and that the plea was not voluntary because it was motivated by his belief that his attorney was not prepared for trial.

The defendant argued before the trial court that he thought the sentence for the felony-murder charge was 20 years. His claim was contradicted by his counsel who testified that he explained to the defendant the sentence would be life with parole eligibility after 20 years. Moreover, the record demonstrates that the trial court informed the defendant during the plea hearing that the sentence was life in prison with parole eligibility after 20 years. The defendant does not make this claim on appeal and has abandoned this issue. See *State v. Kesselring*, 279 Kan. 671, 692, 112 P.3d 175 (2005).

The defendant also argued before the trial court that he entered his plea because he thought his attorney was not prepared for trial. This claim was also contradicted by his counsel who testified that he was fully prepared for trial. The defendant's unsupported subjective belief his attorney was not prepared for trial is not sufficient to demonstrate good cause for withdrawal of the plea. " '[M]istaken subjective impressions, in the absence of substantial objective proof showing that they were reasonably justified, do not provide sufficient grounds upon which to vacate a guilty plea.' [Citation omitted.]" *State v. Snyder*, 10 Kan. App. 2d 450, 452, 701 P.2d 969 (1985) (defendant's subjective belief that judge was biased and thus his trial would be unfair was not supported by objective evidence and was insufficient to demonstrate good cause for plea withdrawal); see also *State v. Shears*, 260 Kan. 823, 834, 925 P.2d 1136 (1996) (quoting *Snyder*, 10 Kan. App. 2d at 452). In any event, the defendant makes no such claim in his appeal and has also abandoned this issue. See *Kesselring*, 279 Kan. at 692.

2. *New claims advanced on appeal.*

For the first time on appeal, the defendant claims that he was confused about and did not understand the nature of the felony-

murder charge to which he pled. In support of this claim the defendant argues that the information filed was amended twice during his plea and that he was never given a copy of the amended information to felony murder before he entered a plea. In addition, the defendant argues that he was wavering as to whether to enter a plea and that he did not have enough time to discuss this with his attorney. Moreover, he argues that the court never asked him if he was satisfied with his court-appointed attorney.

The State argues that the above issues were not raised before the trial court and therefore cannot be raised in this appeal. In some respects, the State's argument has validity.

Had the above issues been raised before the trial court, testimony would have been presented at the hearing, considered by the trial court, and resolved with as much understanding as could be gleaned from the testimony and arguments of counsel. Thus, we have held, as a general rule, that an issue not raised before the trial court cannot be raised on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). In *State v. McDaniel*, 255 Kan. 756, 765-66, 877 P.2d 961 (1994), this court refused to consider a claim that the trial court failed to comply with the requirements of K.S.A. 22-3210 where that claim was raised for the first time on appeal.

On the other hand, the requirement that a guilty plea be knowingly and intelligently made is constitutionally based. See *Edgar*, 281 Kan. at 36-37 (citing *Brady*, 397 U.S. at 748). Thus, the issue presents constitutional concerns, although this point was not clearly made by the defendant in his appellate brief.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. However, this court has recognized three exceptions to the general rule: (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the trial court is right for the wrong reason. *Williams*, 275 Kan. at 288-89.

The first exception does not to apply as the issue of whether the defendant understood the nature of the charge includes a question of fact not fully fleshed out because this issue was not raised below.

The second exception—consideration of the issue is necessary to serve the ends of justice or prevent the denial of fundamental rights—is also not applicable. The issue in this case is not novel, so it is difficult to see how addressing it serves the ends of justice. Further, as discussed below, the record as a whole demonstrates the defendant was adequately informed of the nature of the charge and there has been no denial of fundamental rights. Finally, on the issues raised by the defendant before the trial court, the decision of the trial court is supported by the evidence and a proper exercise of judicial discretion.

The defendant has failed to establish that he falls within any of the above exceptions. We therefore may resolve this appeal by application of the general rule: An issue not raised before the trial court cannot be raised on appeal. *Williams*, 275 Kan. at 288; *McDaniel*, 255 Kan. at 765-66.

Nevertheless, we have reviewed the entire record and all facts set forth above and we wish to make it clear that the record supports the conclusion that the defendant understood the nature of the charge prior to his plea and had ample time to discuss the charge with his appointed counsel.

The defendant was initially charged with second-degree murder. Given his prior felony convictions under the Kansas Sentencing Guidelines, the sentence for this charge would have been 51 years. For this reason the charge was amended to first-degree premeditated murder with a sentence of life. When it was discovered that charge authorized parole eligibility after 25 years, the defendant stated that the 25 years was a deal breaker and he would only agree to a sentence with parole eligibility after 20 years, the sentence which would be imposed for felony murder. Prior to amending the charge to felony murder, a recess was taken for some 50 minutes in order to give time to the defendant to converse with his counsel.

A guilty plea admits all elements of the crime charged. Such a plea is not knowingly and voluntarily made under constitutional due process standards where the defendant does not understand those elements as they relate to the facts. *Clinkingbeard v. State*, 6 Kan. App. 2d 716, 717-18, 634 P.2d 159 (1981). A plea is not "voluntary in the sense that it constituted an intelligent admission

that he committed the offense unless the defendant received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.' " *Henderson v. Morgan*, 426 U.S. 637, 645, 49 L. Ed. 2d 108, 96 S. Ct. 2253 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334, 85 L. Ed. 859, 61 S. Ct. 572 [1941]); see also *Edgar*, 281 Kan. at 37 ("A keystone of an intelligent plea is for the defendant to be informed of the nature of the charges.").

In this case, although the defendant was not provided a copy of an amended information and the trial judge did not personally inform the defendant of the nature of the charge and the elements thereof, the record is sufficient to demonstrate that the defendant was sufficiently informed of the nature of the charge to which he pled and that he understood that charge as it related to the facts.

The requirement that the defendant be informed of and understand the nature of the charge does not mean that the judge taking the defendant's plea must explain the elements of the crime to the defendant on the record. In fact, it has been held that a guilty plea is knowingly made where the record demonstrates that the nature of the charge and the elements of the crime were explained to the defendant by defense counsel. *Bradshaw v. Stumpf*, 545 U.S. 175, 183, 162 L. Ed. 2d 143, 125 S. Ct. 2398 (2005). Further, even where the record fails to show that the nature of the charges were explained to the defendant, "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Henderson*, 426 U.S. at 647.

After consultation with defense counsel and further consultation with the county attorney, the prosecutor amended the charge to felony murder on the record, noting the specific changes to the charge and setting out the underlying felony of robbery and the elements of that offense. From the manner in which the prosecutor stated the changes, it appears that the prosecutor was following the hard copy of the premeditated murder charge that was being amended:

"[THE PROSECUTOR]: . . . Just so we are clear, the amended information will read, murder in the first degree, but then pursuant to subsection (b)(2), as

opposed to (b)(1) as previously noted on the record, (b)(2) is the felony murder application for [first-degree] felony murder, an inherently dangerous felony as to be underlying or linked to the crime. And that pursuant to 22—I'm sorry—21-3436, which lists out the inherently dangerous felonies under subsection (a)(3) of that statute lists the crime of robbery, which is a violation of 21-3426.

"Crime of robbery, lines out this is the taking of property from the person or presence of another by force or by threat of bodily harm to any person. It is listed as a severity level 5 person felony. While Mr. Harned has not been charged separately with robbery, we are using the underlying elements of robbery here today to prove the inherently dangerous underlying felony for the felony murder, as opposed to murder in the first degree."

Certainly this recitation of the amended charge was not a clear presentation of each and every element of felony murder. The record does not have to show that each and every element was read to the defendant. In determining whether a plea was knowingly made, the question is whether the defendant was informed of and understood the nature of the charges as they related to the facts. *Clinkingbeard*, 6 Kan. App. 2d at 717. Where the record affirmatively discloses " 'a knowing and voluntary plea,' " due process is satisfied. See 6 Kan. App. 2d at 717 (quoting *Brady*, 397 U.S. at 747-48 n.4).

The recitation of the amended charge, coupled with the prosecutor's additional facts to support the underlying felony of robbery, informed the defendant that the charge was felony murder and that an essential element was the commission of underlying inherently dangerous felony of robbery. See K.S.A. 21-3401(b); K.S.A. 21-3426.

Moreover, it is appropriate to presume that the elements of the felony-murder charge were explained to the defendant during the 50-minute recess. When it was discovered during the plea hearing that the parties were mistaken about the applicable penalty for the first-degree premeditated murder charge, a recess was taken to decide what to do. It was determined during that recess that in order to achieve the life sentence with parole eligibility after 20 years, the crime of conviction had to be first-degree felony murder. When everyone returned, defense counsel informed the court that it was agreed that the charge was to be amended from first-degree premeditated murder to first-degree felony murder, and defense

counsel asked the court to permit the amendment. Obviously, the amendment to felony murder was the subject of the recess.

Although defense counsel did not testify that he explained the elements of that offense to the defendant during that recess, that question was not asked because the defendant has raised this issue for the first time on appeal. In any event, in the absence of any evidence to the contrary, it is reasonable under the unique facts of this case to presume that during that recess, defense counsel "explain[ed] the nature of the offense in sufficient detail to give [the defendant] notice of what he [was] being asked to admit." *Henderson*, 426 U.S. at 647.

Finally, the court specifically asked the defendant if he understood what was going on and why the charge needed to be amended, and he said he did. The court also asked him if he had any questions about the amendment, or if he wanted to change his mind about the plea, and the defendant did not. After the amendment was made on the record and the additional facts supporting the underlying felony of robbery were stated, the court asked the defendant if he still wished to enter a no contest plea to the charge of felony murder, and the defendant said he did.

The defendant's claim that the trial court made no finding of guilt was also made in passing, with no argument or citation to authority. Thus, it should be deemed waived. Even if it were to be considered on the merits, the court has already held that the failure of the trial court to orally enter a finding of guilt does not invalidate a guilty plea:

"When the record, docket entry, and subsequent actions by the court and parties indicate that the defendant intended to plead guilty, the plea was properly taken, sentencing followed, and there was no objection to the process, the failure of the judge to orally articulate an express entry of judgment of guilt will not invalidate the plea, conviction, or sentence." *State v. Heffelman*, 256 Kan. 384, Syl. ¶ 5, 886 P.2d 823 (1994).

The record as a whole sufficiently demonstrates that the defendant had the opportunity to discuss the amendment information to a charge of felony murder with his counsel before entering his plea, understood the nature of the charge when he entered his plea, and acknowledged to the court upon entry of his plea that he

understood what was happening and why the amendment was necessary. Under these circumstances and the record as a whole, we conclude that the defendant voluntarily and knowingly entered his plea to the charge of felony murder.

Affirmed.