No. 92,512

STATE OF KANSAS, *Appellee,* v. LARRY SHOPTEESE, JR., *Appellant.*

(153 P.3d 1208)

Opinion filed March 16, 2007.

*Lydia Krebs,* assistant appellate defender, argued the cause, and *Patrick H. Dunn,* assistant appellate defender, was on the brief for appellant.

*Kevin M. Hill*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This appeal arises from the district court's denial of defendant Larry Shopteese, Jr.'s motion to withdraw his no contest pleas to one count of first-degree murder and one count of aggravated burglary. Shopteese asserts that his marginal I.Q., coupled with his unmedicated mental illness, rendered his pleas involuntary.

## Factual and Procedural Background

On February 19, 2002, Cletuis Samqua and his daughter, Judy, arrived home to find Shopteese in their living room. Although details were disputed, the results of the encounter were that Shopteese shot and killed Cletuis and took money from Judy before she fled to a neighbor's house. Shopteese took firearms from the home and money from Cletuis' wallet. He then fled into nearby woods, where he lived on berries and pond water for 2 days before he was apprehended.

Shopteese was charged with felony murder, aggravated robbery, aggravated battery, aggravated burglary, burglary, and theft. Counsel was appointed, and Shopteese entered a not guilty plea. Eventually, this lawyer withdrew, and a new lawyer was appointed. In early December 2002, the new lawyer sought and obtained a competency evaluation of Shopteese.

Dr. David Elsbury, of the Kanza Mental Health and Guidance Center, filed a report on December 16, but Elsbury was unable to make a determination of Shopteese's competency. Elsbury's report noted that Shopteese had finished eighth grade, had unsuccessfully attempted to obtain a GED, and functioned between a second- and fourth-grade level. Shopteese was "oriented to time, place, person, and situation" and "alert and capable of listening and following instructions"; however, Shopteese reported hearing voices and "shushing sounds" that interfered with his ability to concentrate or follow conversations. Shopteese also reported visual hallucinations, such as floating animals. Elsbury suggested that Shopteese "demonstrated the capacity to understand his current legal

situation and could name and generally describe the charges against him"; he also had "a good capacity to understand and disclose to counsel available pertinent information surrounding the alleged offenses. . . . . He wants to protect himself in the legal process and use his attorney in that task." However, Elsbury noted: "The defendant has a weak understanding of the possible pleas and what they mean. The defendant's view of the possible consequences if found guilty seem incomplete and he doesn't appear to have an adequate grasp of the seriousness of the charges and the full range of penalties that could be levied against him." Elsbury diagnosed Shopteese with "Psychotic Disorder, Not Otherwise Specified" and "Mild Mental Retardation."

Elsbury recommended Shopteese be sent to Larned State Security Hospital (Larned) for further evaluation. After a hearing on December 20, the district court judge entered an order consistent with the recommendation.

Shopteese was admitted to Larned on January 7, 2003, and remained there for evaluation and treatment for 3 months. A March 5, 2003, report by Dr. J.L.L. Fernando suggested Shopteese was not competent to stand trial at that time, although he probably would become competent in the foreseeable future. Fernando noted that defendant reported vague hallucinations, which, Fernando suggested, could be related to head trauma or "huffing" of gasoline vapors. Fernando also noted Shopteese's limited intelligence, his distracted nature, his low cognitive functioning, and his illiteracy. Fernando suggested these attributes hindered Shopteese's competence and would make it difficult for him to work with an attorney "in the preparation and presentation of a legal defense." Fernando nevertheless concluded that Shopteese's "borderline intellectual functioning" was not the primary reason for his confused thoughts, and that "treatment in the form of psychotropic medication would likely allay his symptoms." Like Elsbury, Fernando diagnosed Shopteese with "Psychotic Disorder, Not Otherwise Specified" and what he called "Borderline Intellectual Functioning."

The district court judge held a competency hearing on March 21, 2003, and, based on Fernando's report and testimony along

with Elsbury's report, found Shopteese incompetent to stand trial. The judge ordered Shopteese committed for additional evaluation and treatment at Larned for 3 more months.

On May 21, 2003, Dr. Dara Johnson of Larned informed the court that Shopteese remained incompetent to stand trial but certified that he had a substantial probability of attaining competency in the foreseeable future. Johnson recommended Shopteese remain at Larned, which he did.

On September 5, 2003, Dr. Leonardo Mabugat of Larned submitted a report indicating Shopteese was then competent to stand trial, despite Mabugat's agreement with Shopteese's earlier diagnoses of "Psychotic Disorder, Not Otherwise Specified, and Borderline Intellectual Functioning." Mabugat's examination revealed that Shopteese "displayed good understanding of the courtroom proceedings, the roles of the participants in a criminal trial and his expected behavior in court. He expressed his willingness to work with his attorney" and "expressed his intention to remain at [Larned] instead of going back to court to face his legal problems." In Mabugat's opinion, Shopteese had begun malingering. He "was seen to deliberately give indirect responses to convince the team he was not competent to stand trial." Shopteese was taking sleep and antipsychotic medication. "In order to remain competent and maintain affective stability," the Larned staff recommended that Shopteese continue these medications.

Based on the Larned reports, the district court judge set Shopteese's trial for February 2, 2004.

On January 2, 2004, Shopteese's counsel submitted a new motion to determine competency, accompanied by an affidavit from Dr. Robert Barnett, an expert hired to testify concerning a mental disease or defect defense.

On January 29, 2004, the State filed an amended complaint charging only felony murder, aggravated robbery, and aggravated burglary. Shopteese and the State eventually agreed that Shopteese would plead no contest to the murder and aggravated burglary charges, in exchange for the State's dismissal of the remaining aggravated robbery charge. Shopteese's counsel filed a statement regarding plea negotiations, affirming that he had explained to his

client the details of the charges, the possible sentences, the effect of the pleas, and the fact that the judge alone would decide on sentences. Counsel further affirmed that Shopteese understood and that it was Shopteese's decision to enter the pleas.

The district judge's January 30, 2004, plea hearing journal entry states:

"[T]he defendant satisfactorily assures the Court that he enters the plea of no contest to Counts I and III of the State's amended complaint with full understanding of the nature and consequences of the plea, with full knowledge of the constitutional rights which he has as a defendant and of the specific constitutional rights he is waiving by entering his plea."

During the plea hearing, the following colloquy occurred:

"Q. [The Court]: Are you under any order of disability based upon a mental illness petition to your knowledge?
"A. [Defendant]: No, sir.
"Q. Are you taking any prescription medication?
"A. Yes, sir.
"Q. Would you tell me what that is if you know?
"A. Geodon and Trazodone.
"Q. Are you taking those regularly?
"A. Yes.
"Q. Are they prescribed by a doctor?
"A. Yes.
"Q. And have you taken them within the last 7 days?
"A. I ran out of medication, sir.
"Q. When?
"A. Let's see, I ran out of them I think it was Monday.
"Q. Do they know that?
"A. Yes.
"Q. And are they obtaining those for you?
"A. I put in a request for them to see the doctor but the doctor hasn't come in yet.
"Q. So you're awaiting to go see the doctor?
"A. Yes.
"Q. Are you feeling physically sick today?
"A. No.
"Q. Can you understand what I'm saying?
"A. Yes, sir.
"Q. Are you seeing anything floating in the air or anything like that?
"A. Yes, sir.
"Q. What?

"A. A 3-D version of everything. I'm cross-eyed, sir.

"Q. So that's what you're having trouble with is your eyes are cross and that causes you to have blurred vision?

"A. Yes, sir.

"Q. Can you hear me though?

"A. Yes, sir.

"Q. I see that you're wearing glasses. Are the glasses not strong enough to correct your vision problem?

"A. I had them since I was 13, sir.

"Q. But it's not affecting your ability to visit with Mr. Tuley or hear what I'm asking you is it?

"A. No, sir.

"Q. Are you feeling any pains or problems because you haven't had that medication in the last couple days?

"A. No, sir.

"Q. Are you taking any kind of over-the-counter medication like Advil or Tylenol or anything like that?

"A. No, sir.

"Q. Are you taking any kind of herbal supplements like echinacea or any of those kind of things?

"A. No, sir.

"Q. Are you under the influence of any alcohol, intoxicant of any kind, cereal malt beverage, beer, liquor, wine, nonprescribed drugs, or toxic vapors or inhalants?

"A. No, sir.

"Q. Are you taking any kind of substances drug or otherwise that would defeat your ability to think clearly, focus your attention on the issues before you, to communicate with others including Mr. Tuley your attorney, and to make important personal decisions on your own?

"A. No, sir.

"Q. Do you want me to break that one down?

"A. I understand, sir.

. . . .

"Q. Mr. Shopteese, when I asked you a couple of questions about, were you having trouble seeing things or seeing things?

"A. Yes, sir.

"Q. You indicated you see things in 3-D because you're cross-eyed?

"A. Yes, sir.

"Q. That isn't that you're seeing buildings flying around and things like that, it just happens to be it blurs your vision?

"A. No, sir it's not all, but I have other I don't know how you would say visions, but they're just it's just a big story to talk out.

"Q. You're not having one of those today are you?

"A. Yes, I am.

"Q. Are you having it right now?
"A. Yes.
"Q. What are you seeing?
"A. Well, like different—I look at the wall or so and it has looks like they're all red, all red different designs, like people.
"Q. Now, are they doing anything to you, Mr. Shopteese, are they scaring you?
"A. Every time I turn to look at something different it stays the same picture and just floats.
"Q. All right, Mr. Shopteese, have you been able to understand what we're talking about today?
"A. Yes, sir I understand.
"Q. These things whatever this is that you visualize on the wall or anything like that, that's not affecting your ability to listen and make your decision today is it?
"A. I've learned to try to block that out.
"Q. Okay. And that's part of the cross-eye that you have or the vision problem that you have; is that correct?
"A. Yes, sir.
"Q. All right. And that's your physical vision. That's you looking through your eyeballs, correct?
"A. Yes, sir."

On March 10, 2004, the district judge sentenced Shopteese to life without parole for 20 years on the murder conviction, to run consecutive to a term of 34 months' imprisonment for aggravated burglary.

Six days later, Shopteese sent a handwritten note to the district judge, saying he "would like to appeal [his] case & [he] would like to go to trial." He sent a second note on March 25, saying he was having trouble reaching his attorney but would "like to put in a motion to go to trial and appeal [his] case." Shopteese's appointed counsel had filed a notice of appeal on March 15.

On March 31, Shopteese sent a third letter saying: "I would like to withdraw my Plea" because "I did not know what would happin [*sic*], I wouldn't have took in the Plea, the Plea was not followed and I didn't want to take the Plea. I would like to go to trial."

Shopteese's counsel died January 23, 2005, and new counsel was appointed on the appeal. The case was remanded to the district court for a hearing on Shopteese's request to withdraw his pleas.

At the hearing, counsel argued: (1) Shopteese did not understand the nature of the plea agreement and knew only what he was

assured by his appointed counsel at the time, *i.e.*, that the sentences would run concurrent rather than consecutive and that he would be eligible for parole after 15 rather than 20 years; and (2) the signature on the plea agreement filed with the court was not Shopteese's signature. Counsel also asked the court to take judicial notice of record information on Shopteese's marginal I.Q. and mental illness.

Shopteese testified at the motion hearing. He acknowledged he was present at the plea hearing and signed something at a table in open court, but he said the document he signed was not the plea agreement. He maintained that he had not seen or read the plea agreement that appeared in the record until the week of the hearing on his motion to withdraw his pleas. Had he seen it earlier, he asserted, he would not have agreed to it. Shopteese suggested that a KBI employee had forged his signature on the agreement in the court file. Shopteese also testified that the document he had signed said "I plead no contest that the judge saying that I'm such a young age, I plead no contest to 15 years and be eligible for parole right after that." He said his mother and his former counsel's secretary had copies of the correct document. Shopteese testified on cross-examination that he did not remember the court showing him the plea agreement in the record or asking him if he understood that the court was not bound by his counsel's motion for concurrent sentences. When confronted with the plea hearing transcript, he suggested that it was "a lie." He admitted, however, that he did not have any complaint until after sentencing. On redirect, Shopteese said he had understood the plea agreement to mean he would receive concurrent sentences and would be eligible for parole after 15 years. Had he known the plea agreement would permit him to receive consecutive sentences and go without a chance at parole for 20 years, he would not have entered into it.

After a lengthy discussion about what transpired at the plea hearing, the district judge made specific findings that Shopteese had been informed of the potential range of sentences and of his rights, including those he was waiving by pleading no contest. The judge also found that Shopteese was aware the court was not bound by any sentencing recommendation. The judge recited portions of the

transcript from the plea hearing in which Shopteese's signature was authenticated. The judge then made findings that Shopteese had been represented by competent counsel; that he had not been misled, coerced, mistreated, or unfairly taken advantage of; that the plea was freely, fairly, and understandingly made; and that Shopteese met the requirements for mental competence. The judge noted that Shopteese

"had a sufficient present ability to consult with his attorney which he showed with a reasonable degree of rational understanding. He appeared to understand the questions I was asking. He was able to make a proper response . . . . He understood what he was there for. He understood what the charges were. . . . [H]e met the standards for mental competence."

Based on these findings, the district judge concluded that the there was no manifest injustice requiring withdrawal of Shopteese's pleas.

## Analysis

At the outset, we observe that the issue Shopteese now raises— his marginal I.Q. and unmedicated mental illness rendered his no contest pleas involuntary—was never raised before the district judge. Issues not raised before the district court cannot generally be raised on appeal. See *State v. Rojas*, 280 Kan. 931, 932, 127 P.3d 247 (2006). Exceptions to this general rule may be granted if (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground. *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006).

Because Shopteese's argument that a court's acceptance of a plea by an incompetent defendant implicates due process, see *Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969); *Dusky v. United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960); we choose to address the merits to serve the ends of justice and prevent denial of a fundamental right.

Regarding our standard of review, the denial of a motion to withdraw a plea after sentencing lies within the trial court's discretion. An appellate court will not disturb the decision absent an abuse of that discretion. See *State v. Harned*, 281 Kan. 1023, Syl. ¶ 1, 135 P.3d 1169 (2006); *State v. Muriithi*, 273 Kan. 952, 955, 46 P.3d 1145 (2002); *State v. Bey*, 270 Kan. 544, Syl. ¶ 3, 17 P.3d 322 (2001). Judicial discretion will vary depending upon the character of the question presented for determination. Generally, the trial court's decision is protected if reasonable persons could differ upon the propriety of the decision as long as the discretionary decision is made within and takes into account the applicable legal standards. However, an abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider statutory limitations or legal standards. *State v. Edgar*, 281 Kan. 30, 36-38, 127 P.3d 986 (2006). The defendant bears the burden of establishing such an abuse of discretion. *Bey*, 270 Kan. at 545-46.

Subsection (a) of K.S.A. 2006 Supp. 22-3210 sets out the requirements for accepting a guilty or no contest plea:

"(a) Before or during trial a plea of guilty or *nolo contendere* may be accepted when:

(1) The defendant or counsel for the defendant enter such plea in open court; and

(2) in felony cases the court has informed the defendant of the consequences of the plea, including the specific sentencing guidelines level of any crime committed on or after July 1, 1993, and of the maximum penalty provided by law which may be imposed upon acceptance of such plea; and

(3) in felony cases the court has addressed the defendant personally and *determined that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea;* and

(4) the court is satisfied that there is a factual basis for the plea." (Emphasis added.)

To be constitutionally valid, guilty or no contest pleas and their resulting waiver of rights " 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' " *Edgar*, 281 Kan. at 36-37 (quoting *Brady v. United States*, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 90 S. Ct. 1463 [1975]). The term "voluntary" implicitly

requires that the defendant be competent. See *Van Dusen v. State,* 197 Kan. 718, 722-25, 421 P.2d 197 (1966).

As Shopteese argues, competence is defined by statute. "[A] person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable: (a) To understand the nature and purpose of the proceedings against him; or (b) to make or assist in making his defense." K.S.A. 22-3301(1).

" '[I]f the accused is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition with reference to such proceedings, and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subject his mind may be deranged or unsound.' [Citation omitted.]" *Van Dusen,* 197 Kan. at 722-23

It is undisputed here that Shopteese's competency was initially dubious. He was evaluated and treated for a period of 9 months at Larned State Security Hospital and was eventually pronounced competent to stand trial. While the initial finding of incompetence was based primarily on Shopteese's inability to "appreciate the seriousness of the potential consequences" of the charges, the majority of the reports on his condition stated that he appeared to understand the nature of the legal proceedings against him and was able to communicate with his lawyer.

"Although a competency determination is not dispositive of whether a plea was knowingly and voluntarily made, . . . it does provide evidence that tends to contradict the defendant's contention that he was somehow mentally or emotionally disturbed to the point that he could not understand the plea proceedings." *State v. Morris,* 254 Kan. 993, 1005, 869 P.2d 739 (1994). Still, the voluntariness of a plea can be determined only by considering *all* of the relevant circumstances surrounding it. *Brady,* 397 U.S. at 749; *Muriithi,* 273 Kan. at 962-63.

When all of the circumstances surrounding this proceeding are considered, they tend to support the district judge's ruling on Shopteese's motion. The transcript of Shopteese's plea hearing contains 45 pages. On 30 of those 45 pages, the district judge directly addressed Shopteese, making painstaking inquiry, to which Shopteese made appropriate responses.

At the hearing on the motion to withdraw, the same district judge who took Shopteese's pleas evaluated this plea hearing transcript. He noted that Shopteese was originally charged with six counts; that he had been informed at the preliminary hearing and at arraignment of the potential sentences for each of those charges; that the plea agreement was reached after negotiation between the parties; that four of the charges had been dismissed in exchange for defendant's no contest pleas to the remaining two; and that "[t]he Court then spent a significant period of time on the issue of the plea. The Court as it does in each case, went through a providential inquiry to determine whether [defendant] understood what was, what the plea was, what the [e]ffect of the plea was." This was a fair description of what occurred at the plea hearing. The district judge conducted a thorough discussion with Shopteese to discern his intent and his ability to pursue that intent without confusion or coercion. Also appropriately, the judge evaluated at the motion hearing whether Shopteese had been represented by competent counsel; whether he had been misled, coerced, mistreated, or unfairly taken advantage of; and whether the pleas were freely, fairly, and understandingly made. Those were the correct inquiries to determine manifest injustice. On the last issue in particular, the judge stated:

"The Court made a significant inquiry in this case regarding first of all [defendant's] competence to enter the plea. Whether he was on any medication, whether he had any trouble hearing me. I went through a series of questions to which he made responses. At no time during the sentencing hearing did Mr. Shopteese look confused. At times [his counsel] would interject statements in the transcript, but the answers were being made by Mr. Shopteese in direct response to my questions."

In addition, at the time of the pleas, the judge asked Shopteese if he was on any medication. Shopteese indicated that, while he had been on medication, he had run out. However, he denied having any pain or any problems from not taking the medication. Although he said he was seeing "a 3-D version of everything," he attributed this to the fact he was cross-eyed and his vision blurred. He said these issues were not affecting his ability to visit with his attorney or hear the court. He also affirmed that he was not "taking

any kind of substances drug or otherwise that would defeat [his] ability to think clearly, focus [his] attention on the issues before [him], to communicate with others . . . and to make important personal decisions on [his] own." When Shopteese responded "No, sir," the judge asked if he wanted that question broken down, and Shopteese let the judge know that was not necessary. Later in the plea hearing, the judge asked Shopteese again about his vision, specifically, whether anything he was seeing was scaring him. Shopteese again was reassuring; and he affirmed that his vision issues were part of his crossed eyes, that he had learned to block them out, and that they were not affecting his ability to listen or to make a decision.

We agree with the district judge that consideration of all of the circumstances surrounding Shopteese's pleas leads to the conclusion that he had

"a sufficient present ability to consult with his attorney which he showed with a reasonable degree of rational understanding. He appeared to understand the questions I was asking. He was able to make a proper response . . . . He understood what he was there for. He understood what the charges were. . . . [H]e met the standards for mental competence."

Moreover, we note this conclusion is further supported by Shopteese's later efforts to withdraw his pleas. His communication to the court reflected an understanding of his pleas and their consequences.

We therefore hold there was no manifest injustice in this case; the district court did not abuse its discretion in denying Shopteese's motion to withdraw his pleas.

Affirmed.

ALLEGRUCCI, J., not participating.

LOCKETT, J., Retired, assigned.