NOT DESIGNATED FOR PUBLICATION

No. 123,185

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CORY WAYNE BENTLEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed April 29, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HURST, P.J., GARDNER, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: This is the direct appeal of Cory Wayne Bentley following his convictions for possession of methamphetamine with intent to distribute, criminal possession of a firearm by a convicted felon, driving while his license was suspended or canceled, and failing to maintain a single lane while driving. He was sentenced to a controlling prison term of 155 months and a consecutive 6-month jail sentence for driving while his license was suspended or canceled.

These convictions arose out of a traffic stop following several traffic infractions. It was not a typical traffic stop by the police. The car Bentley was driving was an overdue

rental car, so the rental agency remotely activated a device on the car that brought it to a stop in the middle of Hillside Street in Wichita. Police officers Nicholas Long and David Inkelaar had been following Bentley based on their suspicion that he may have been linked to a recent drive-by shooting.

Officers Long and Inkelaar approached the stopped vehicle, and the driver identified himself as Cory Bentley. Long asked Bentley for his driver's license. Bentley told Long that he did not have a driver's license and showed Long his prison I.D. number from the Kansas Department of Corrections. Inkelaar searched a law enforcement database and discovered that Bentley's driver's license had been suspended and he was the subject of two outstanding city bench warrants. Bentley was placed under arrest. Before being searched, Bentley told Long that he had a gun and drugs in his pocket. The drugs found on his person consisted of two bags of methamphetamine—one bag containing 7.13 grams and the other containing 20.57 grams—for a combined weight of 27.7 grams.

Before the police searched Bentley's car, Bentley stated that he had another gun in the car. The gun was found between the driver's seat and center console. Empty baggies with no drug residue were also found in the car. No pipes, syringes, or other drug paraphernalia were found.

Back at the police station, Bentley was interviewed by Detective Daniel Weidner. Bentley admitted the guns and the drugs were his. He bought the guns a couple of days earlier. He bought the drugs the evening before his arrest. Bentley admitted that he used methamphetamine and said he had planned to use some from the "smaller bag" later that day. Bentley told Weidner he would have to "break the house off" with the larger bag. Weidner understood this slang expression to mean that Bentley would share the contents of this bag with others in exchange for them providing him a place to stay for the night. Bentley had told Weidner that "he moves from motel to motel or stays place to place,"

2

and that he would have to "break the house off"; that is, he was going to have to share some of the drugs in return for being able to stay with various people who provided him with shelter.

Bentley was charged with the crimes noted earlier. Shortly before trial, Bentley filed three motions to suppress. Following an evidentiary hearing, the district court denied Bentley's motions. At the jury trial that followed Bentley was convicted, and his appeal brings the matter to us.

*Voluntariness of Statements During Police Interrogation*

For his first issue on appeal, Bentley argues that the district court erred when it found the statements he made to Detective Weidner during his interrogation at the police station were voluntary and, therefore, admissible at trial.

*Preservation*

As a preliminary matter, the State argues that this issue is not properly before the court because Bentley failed to lodge a timely and specific objection to the admission of these statements. According to the State, at the hearing on Bentley's pretrial motions to suppress, Bentley's sole contention regarding Detective Weidner's interrogation at the police department was that Bentley's statements were involuntary because he was high on methamphetamine at the time. Thus, at trial, when Bentley made a standing objection—which the court granted—based on the district court's adverse rulings on Bentley's motions to suppress, the State contends that the continuing objection applies only to Bentley's claim that he was high on drugs during the interrogation.

Bentley filed three pretrial suppression motions. Bentley filed two motions in one document entitled "Motion to Suppress Illegally Seized Evidence Pursuant to K.S.A. 22-

3

3216 and Motion to Suppress Confession or Admission Pursuant to K.S.A. 22-3215." He then filed a third motion that same day, which was entitled "Motion to Determine Voluntariness." That motion specifically referred to the issue of voluntariness as required by *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). But because of the overlapping claims in these motions, at the hearing the court and the parties treated them as only two motions: one to suppress illegally obtained evidence and statements at the scene and the other to suppress Bentley's later statements at the police station under *Jackson v. Denno*.

At the evidentiary hearing on these motions, the State introduced into evidence the police videos at the scene of the traffic stop and at the later interrogation at the police station. The State requested that the court "view those when the Court has time, and then make a ruling." After hearing the testimony, the court adjourned in order to view the videos introduced into evidence.

When the court reconvened, about two weeks before trial, the court heard the arguments of counsel and thereafter made its ruling.

Bentley's counsel argued Bentley's car stopping in the middle of the street was the result of police action in directing the car rental agency to remotely stop the vehicle, and that there was no probable cause for doing so. He stated: "[E]verything about this stop is caused by law enforcement officers, who decide that they should reach out to a rental car company and remotely stop a vehicle in motion." He further argued that the opportunity to interrogate Bentley at the scene and at the police department was created by the police "by stopping him remotely, using the GPS technology through Kwik Kars . . . without any warrant, without any basis."

Bentley's counsel referred to Detective Weidner's "prolonged conversation" with Bentley at the police station, Weidner's "promises about what he's going to do with the

4

prosecution and how Mr. Bentley can benefit from those things down in court," Weidner's focus on Bentley as a victim rather than a suspected drug dealer, and Bentley probably being high on methamphetamine at the time.

The State argued that the traffic infractions provided a lawful basis for the traffic stop. It was determined at the scene that Bentley had outstanding arrest warrants, which justified taking him into custody. Bentley then volunteered that he had a weapon and drugs in his pocket, and the police conducted a search incident to his arrest. Bentley volunteered that there was another weapon in the car, justifying a search of the car. The State argued that the statements at the scene were spontaneous utterances that were voluntary and admissible.

As to the statements at the police station, "they were under Miranda" and Bentley had freely and voluntarily waived those rights. The State contended that the video of the police station interrogation showed that Bentley's statements were voluntary. The State argued that statements made to Detective Weidner

> "were under Miranda, there was no indication that he did not freely and voluntarily waive
> those rights, he agreed to speak with him. And I would ask the Court to find that those are
> voluntary, as well, based on the evidence presented and the video that the Court had the
> opportunity to view."

In announcing its ruling, the court first addressed the motion to suppress evidence associated with the stop. With respect to Bentley's interrogation at the police station, the court addressed each of the factors enumerated in *State v. Davis*, 306 Kan. 400, 417, 394 P.3d 817 (2017), and found that Bentley's statements were freely and voluntarily made.

Officer Long testified on direct examination at the end of the first day of trial that as he was following Bentley he observed various traffic infractions before Bentley's

5

vehicle came to a stop. Long testified that as he followed Bentley through Wichita, he observed Bentley turn from westbound Kellogg onto Hillside and then come to an abrupt stop in the inside lane of Hillside. The prosecutor then asked if Long knew why Bentley's vehicle came to a stop. Long responded that he did not.

The court recessed for the day. The following morning, before Officer Long resumed testifying, the following exchange took place:

> "[Defense counsel]: Judge, defense objects to witness' last answer, regarding the stop, pursuant to our two pretrial motions. We object to evidence of the stop seizure interrogation.
> "THE COURT: Overruled, as previously ruled.
> "[Defense counsel]: Judge, defense moves for a standing objection—
> "THE COURT: And that—
> "[Defense Counsel]: —for this witness and all witnesses.
> "THE COURT: That's granted."

The State contends that Bentley's "lone argument during pretrial proceedings was that he was 'likely' high on methamphetamine during the interrogation." The State argues that Bentley is pulling a bait and switch by now raising on appeal the claim that his statements were not voluntarily made as required by *Jackson v. Denno* as applied in Kansas using various factors identified in *Davis*.

We view the pretrial suppression proceedings more broadly than does the State. Under K.S.A. 60-404,

> "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

6

Here, Bentley objected in his pretrial motions to the admission of physical evidence and statements he made to the police. The district court court's ruling on Bentley's pretrial motions was about two weeks before trial. Of course, that pretrial ruling was tentative in the sense that as the evidence came in during the trial the court's ruling could change. See *Luce v. United States*, 469 U.S. 38, 41, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Thus, a timely and specific objection at trial is required to prevent the erroneous admission of evidence based on the actual facts and circumstances at the point in the trial when the evidence is proffered. *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). But as stated in *State v. Houston*, 289 Kan. 252, 271, 213 P.3d 728 (2009), while the admission of evidence following an adverse ruling on a suppression ruling must be preserved by a contemporaneous objection, that can be accomplished by a continuing objection at trial, "thereby eliminat[ing] the need for a later trial objection."

Here, Bentley's counsel objected during Officer Long's testimony about what caused Bentley's vehicle to come to a stop in the middle of the roadway. In his earlier effort to suppress the physical evidence and incriminating statements that followed the traffic stop and his arrest, Bentley argued that (1) his vehicle came to a stop due to actions by the auto rental agency at the direction of the police without them having any probable cause or reasonable suspicion, and that (2) his later statements during the police interrogation following his arrest were not voluntary as required under *Jackson v. Denno*. Thus, this was an opportune time for Bentley's counsel to renew his pretrial objections to the admission of the anticipated evidence of what transpired following the stop. Bentley's counsel objected—rather obliquely—"to evidence of the stop seizure interrogation." From this, we take it that Bentley was renewing his pretrial objections to the validity of the stop, the validity of his subsequent arrest, and the admissibility of evidence obtained through police interrogation thereafter. The objection was overruled, but the court gave Bentley a standing objection to such testimony.

Under these circumstances, we find that Bentley's counsel preserved his pretrial objections to the admission of Bentley's statements to the police during his interrogation, which included all the factors relating to voluntariness enumerated in *Davis*, which were addressed by counsel and by the court in its ruling on the suppression motion, not just the issue of whether Bentley was high on drugs at the time of the interrogation.

*The Voluntariness of Bentley's Statements to the Police*

In considering the merits of the district court's ruling on the admissibility of Bentley's statements to the police, we examine the district court's findings of fact to determine whether they are supported by substantial competent evidence without reweighing the evidence or reexamining the credibility of the witnesses. *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021); *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014). Here, Bentley does not challenge the district court's factual findings. Instead, he asks us to view the video of the police interview to make our own de novo determination of the voluntariness of his statements to the police. While the video is important evidence, we are not free to totally ignore any sworn testimony provided at the hearing that the district court relied on in its analysis. In any event, we have unlimited review of whether the district court should have suppressed the evidence under the facts established in the testimony and in the video evidence of the interrogation. See *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

The State has the burden to prove by a preponderance of the evidence that the statements at issue were the product of the defendant's free and independent will. *State v. Mattox*, 305 Kan. 1015, 1042, 390 P.3d 514 (2017). In doing so, the court looks at the totality of the circumstances surrounding the confession to determine whether the confession was voluntary by considering the following nonexclusive factors: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's

8

age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *Davis*, 306 Kan. at 417.

> "'These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citation omitted.]" *Mattox*, 305 Kan. at 1043.

Bentley concedes he is fluent in the English language and that factor would not weigh against the voluntariness of the statements he made. But he contends the other factors—which we will address in turn—do not support a finding that his statements were voluntary.

*—Bentley's mental condition*

Bentley told Detective Weidner that he had suffered from seizures due to K-2 use at some time in the past, but Bentley did not reveal when those occurred. He did not identify any other medical conditions. Based on our review of the video of the interview, there is no indication that Bentley's seizure disorder affected the voluntariness of his statements.

The district court noted, and the video confirmed, that Bentley was "distraught, sad, crying" during the interview. Detective Weidner testified that Bentley was crying when he was arrested because he said he knew he was going back to prison for a long time and he was still crying when he was in the police interview room. We find no

9

evidence that Bentley being upset about the prospect of returning to prison caused or contributed to cause him to make involuntary statements to the police.

Detective Weidner testified that Bentley responded appropriately to the questions he asked throughout the interview. Our review of the video confirms this. Weidner did not remember discussing alcohol use with Bentley, but he remembered Bentley telling him he used methamphetamine the night before. Even so, Bentley stated that he was clearheaded at the time of the interview. Weidner, who had been doing drug investigations since 2009, did not believe that Bentley exhibited signs of intoxication during the interview. The district court found that Bentley did not exhibit in the video any signs of being under the influence or suffering from withdrawal. The district court found that Bentley responded appropriately to Weidner's inquiries and described Bentley as "extremely clear-minded." We concur with this finding.

*—The manner and duration of the interrogation*

Detective Weidner estimated that Bentley spent a little more than an hour in the interview room before his arrival. Weidner stated on the video that the interview was delayed while he had to talk to his boss and had the car searched, "all that stuff." When asked about the length of the interview, Weidner estimated it lasted about two-and-a-half hours, though he did not spend the entire time in the room with Bentley. At times, Weidner had to step out of the room to have a discussion with his supervisors about "the questions that [Bentley] asked, or go over my notes to make sure I hadn't forgot to ask any questions." The video shows that Weidner stepped out of the interview room five times for a total of about 50 minutes. Taking that into account, the actual interview lasted for a little over two hours. Thus, Bentley's total time in the interview room was about four hours.

10

While Bentley was in the interview room, he had a handcuff on one wrist that apparently was attached to the table in front of him. From the video it appears that one of his legs was also shackled.

The video confirms Detective Weidner's testimony that he did not display a weapon or threaten Bentley during the interview. Weidner also never told Bentley that he would not be charged if he gave Weidner specific answers. Weidner discussed the extent of Bentley's cooperation and that it could be important if it helped solve a shooting case he was investigating. Weidner told Bentley he would relay to the prosecutor Bentley's level of cooperation. But Weidner also told Bentley that what prosecutors charge him with could differ from what police officers arrested him for. Weidner testified that this statement was not meant as any sort of threat. Bentley asked Weidner about being released that day, to which Weidner explained that he did not have the power to release Bentley on bond. In the context of the discussion about bonds, Weidner said—and the video confirms—that he explained the difference between arresting someone and charging someone.

The district court did not believe the duration of the interview was excessive. The district court also noted the interview took place in the afternoon and not the middle of the night. These findings are supported by the record. Moreover, our Supreme Court has rejected similar arguments made by defendants. For example, our Supreme Court stated in *State v. Harris*, 279 Kan. 163, 167-68, 105 P.3d 1258 (2005):

> "Harris complains that his interrogation was coercive because he was shackled throughout the process and the interrogation lasted too long. Harris fails to cite any case law establishing that a nearly 7-hour detention is too long. Likewise he has not pointed to any case law to support his proposition that his confession was involuntary because he was restrained by shackles.

11

"This court has previously determined that 7 hours is not too long to detain an accused for a custodial interrogation. In *State v. Brown*, 258 Kan. 374, 394-95, 904 P.2d 985 (1995), this court concluded that it was not coercive to interrogate a 17-year-old defendant with a 10th grade education for 7 hours before he confessed to murder. Like Harris, Brown only spent about 2 and 1/2 hours being interviewed by officers. The remainder of the time, Brown was alone in a room. However, unlike Harris, Brown was not restrained during the interrogation.

"Although the defendant in *Brown* was not handcuffed or shackled during his interrogation, other case law establishes that this case is not distinguishable based on that fact. In *State v. Makthepharak*, 276 Kan. 563, 78 P.3d 412 (2003), a 16-year-old defendant was handcuffed to a table during a 5 and 1/2-hour interrogation. Nevertheless, the *Makthepharak* court concluded that the defendant's confession was voluntar[y]. 276 Kan. at 568."

More recently, our Supreme Court found that a 14- to-15-hour detention did not render a defendant's statements involuntary. See *State v. Betancourt*, 301 Kan. 282, 294-95, 342 P.3d 916 (2015). Part of our Supreme Court's rationale in finding the statements voluntary stemmed from the fact that breaks were taken, the defendant slept, law enforcement allowed him to go to the restroom, and law enforcement offered and gave food and water. 301 Kan. at 294. Here, the length of Bentley's detention was markedly shorter than the defendant's detention in *Betancourt*; and based on the video, there is no indication that Bentley ever requested to use the restroom or asked for any food or drink.

*—Bentley's ability to communicate on request with the outside world*

During the interview, Bentley asked Detective Weidner if he could make a phone call. Weidner did not allow Bentley to immediately use the phone, but he allowed him to make a couple of calls at the end of the interview.

In *Harris*, our Supreme Court concluded that defendant's denied request to use the phone to call someone about an alibi witness did not weigh in favor of finding the

12

defendant's statements involuntary. 279 Kan. at 168-69. Bentley acknowledges *Harris* but argues "the Kansas Supreme Court held that denial of a suspect's request to phone an alibi did not *by itself* show involuntariness." But Bentley overlooks the fact that law enforcement never allowed Harris to use the phone, while here Weidner denied his initial request but allowed him to make multiple phone calls at the end of the interview. This factor does not weigh in favor of finding Bentley's statements involuntary.

*—Bentley's age, intellect, and background*

At the time of his arrest and subsequent interview, Bentley was 22 years old and had obtained his GED. He had previously been convicted of two person felonies, a juvenile nonperson felony, an adult nonperson felony, an adult nonperson misdemeanor, and a juvenile person misdemeanor.

After Detective Weidner collected Bentley's personal information, he provided Bentley with a form that explained Bentley's *Miranda* rights. After Weidner read Bentley the first statement on the form, Bentley said, "I know my rights, I've been read them plenty of times." Even so, Weidner read Bentley each advisory on the form.

Bentley had prior involvement with law enforcement based on his previous convictions. He told Detective Weidner he understood his rights and chose to sign the *Miranda* waiver. During the hearing on Bentley's motions, the district court found him to be articulate and believed he had an above average intelligence. This appears to be consistent with the video. Taken together, these facts support the district court finding Bentley's statements voluntary.

*—The fairness of the officers conducting the interrogation*

Bentley alleges Detective Weidner acted unfairly because he "made it clear that Mr. Bentley was facing serious consequences for being a convicted felon and having two guns and two ounces of dope." Bentley also argues he exhibited less sophisticated cognitive abilities, but the video does not support this claim. He cites *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), to support his arguments.

Detective Weidner's statements about the consequences Bentley was facing were true. Any felon found in possession of multiple guns and 27.7 grams of methamphetamine would be facing serious consequences. Possession of that amount of methamphetamine with intent to distribute is a severity level 2 drug felony. See K.S.A. 2020 Supp. 21-5705(d)(3)(C). The shortest presumptive sentence a defendant could receive under that severity level of a crime is 92 months' imprisonment if they have an I criminal history score. See K.S.A. 2020 Supp. 21-6805(a). Bentley, who admitted to previous felony convictions, knew he faced a lengthy prison sentence if convicted.

*Swanigan* is distinguishable from Bentley's case. There, Swanigan alleged detectives told him "he would be charged for five convenience store robberies instead of just one unless he confessed." 279 Kan. at 37. Swanigan also had an IQ of 76 and was susceptible to being overcome by anxiety. Our Supreme Court found that Swanigan's statements were involuntary. But this finding was based on a combination of Swanigan's "low intellect and susceptibility to being overcome by anxiety, the officers' repeated use of false information, and their threats and promises." 279 Kan. at 39.

Bentley's situation is more akin to that of the defendant in *Harris*, where our Supreme Court stated:

14

"We have refused to find a confession involuntary when the police encourage the accused to tell the truth. See *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900). The *Kornstett* court stated that 'mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent.' 62 Kan. at 227.

"Here, Detective Chisholm encouraged Harris to tell the truth, but he did not promise any benefit or threaten any harm. . . . There is no indication that Harris' independent will was overcome by Detective Chisholm's forthright comments about possible charges." *Harris*, 279 Kan. at 171-72.

Bentley argues Detective Weidner "implicitly promised that Mr. Bentley might get favorable treatment if he cooperated with police." Weidner admitted that he told Bentley his cooperation could be important and that he would relay his level of cooperation to prosecutors. But Weidner also explicitly told Bentley multiple times he could not make him any promises. Thus, this factor does not support finding Bentley's statements involuntary.

Taking all of these factors into account, we conclude that the district court did not err in admitting into evidence Bentley's statements during the police interrogation.

*The Stipulation to Elements of Criminal Possession of a Firearm*

Bentley contends the district court erred when it accepted a stipulation to several elements of criminal possession of a firearm by a convicted felon without obtaining a valid jury trial waiver on the record.

Bentley raises this argument for the first time on appeal, which ordinarily would bar us from considering it. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). But because consideration of this issue is necessary to prevent the denial of a fundamental

right—the right to trial by jury—we will consider it. See *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020).

Whether Bentley's stipulation to elements of a crime constitutes a knowing and voluntary waiver of his right to a jury trial is a question of law over which we have unlimited review. See *State v. Johnson*, 310 Kan. 909, 918, 453 P.3d 281 (2019).

In *Johnson*, the court instructed the jury, pursuant to a stipulation of the parties, that the defendant, whose charges included being a felon in possession of a firearm, had previously been adjudicated as a juvenile offender for an act that would have constituted a felony if done by an adult. The court did so without ever having advised the defendant of his right to trial by jury and without obtaining in writing or in open court the defendant's personal waiver of that right.

On appeal, Johnson argued the district court erred when it failed to obtain a jury trial waiver before accepting his stipulation. Our Supreme Court stated:

> "The Fifth and Sixth Amendments to the United States Constitution 'entitle[] criminal defendant[s] to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."' And when a defendant stipulates to an element of a crime, the defendant has effectively given up his or her right to a jury trial on that element.
>     "We have consistently held that jury trial waivers 'should be strictly construed to ensure the defendant has every opportunity to receive a fair and impartial trial by jury.' And because every defendant has the fundamental right to a jury trial, courts cannot accept a jury trial waiver '"unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record."' [Citations omitted.]" 310 Kan. at 918-19.

16

In our present case, the State offered into evidence a stipulation by the parties on the two counts of illegal possession of a firearm by a convicted felon. The stipulation—which Bentley, his attorney, and the State's attorney all signed—stated that Bentley had been convicted of a felony within the five years before the day of this incident and the conviction prohibited him from possessing a weapon on that day. The stipulation also stated that Bentley had not possessed a firearm when he committed the previous crime. The district court accepted the stipulation and admitted it into evidence. But the district court never obtained a jury trial waiver on the record. As a result, the district court erred when it accepted Bentley's stipulation. See 310 Kan. at 919.

The State argues that *Johnson* is wrongly decided. But we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We see no such indication. *Johnson* controls.

Accordingly, we reverse Bentley's two convictions for criminal possession of a firearm by a convicted felon and remand the case to the district court for a new trial on these charges.

*Bentley's Claim of Ineffective Assistance of Trial Counsel*

Bentley contends that his trial counsel provided ineffective assistance at trial by pursuing a guilt-based defense without Bentley's express approval.

Following his conviction, Bentley filed a motion claiming he received ineffective assistance of trial counsel. The district court appointed new counsel and conducted an evidentiary hearing before sentencing. The district court denied Bentley's motion, finding that he failed to establish both deficient performance and prejudice.

17

We analyze claims of ineffective assistance of trial counsel under the tests articulated in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984), and adopted by our Supreme Court in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). First, the defendant must show that defense counsel's performance was deficient. If so, the court must determine whether there is a reasonable probability that, absent defense counsel's deficient performance, the results of the trial would have been more favorable to the defendant. *Khalil-Alsalaami v. State*, 313 Kan. 472, 485, 486 P.3d 1216 (2021).

To establish deficient performance the defendant must show that counsel's performance fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential. A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances surrounding the challenged conduct, and to evaluate the conduct from counsel's perspective at the time. The court must strongly presume that defense counsel's conduct fell within the wide range of reasonable professional assistance; that is, the defendant must overcome the strong presumption that, under the circumstances, counsel's actions might be considered sound trial strategy. 313 Kan. at 485-86.

Upon demonstrating counsel's deficient performance, the defendant then must show that defense counsel's deficient performance was prejudicial, i.e., that there is a reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A reasonable probability is a probability sufficient to undermine confidence in the outcome. 313 Kan. at 486.

When, as here, the district court conducted an evidentiary hearing on Bentley's claims of ineffective assistance of counsel, we review the district court's factual findings

18

using the substantial competent evidence standard. We review de novo the district court's legal conclusions based on those facts. See 313 Kan. at 486.

Bentley's sole argument on appeal is that his counsel presented a guilt-based defense at trial without Bentley's approval. He states in his appellate brief: "The only real question is whether Mr. Bentley agreed to such a defense."

But that is not what Bentley contended at the hearing on his motion. In his opening statement at trial, Bentley's counsel told the jury that "this is a case of simple possession and that [Bentley] ought to be convicted of simple possession of methamphetamine." In his closing argument, defense counsel told the jury: "[W]e would ask that you find him guilty of simple possession of methamphetamine." At the hearing on Bentley's posttrial motion, he testified that his trial counsel "didn't seem like he was really trying to defend me. If anything, he made me look more guilty."

"Q. So his theory of the case was that you were a drug user and not a drug seller?
"A. Yes, I believe that's the defense he was going for, but he did not even—he just—yeah, he didn't do me right.
"Q. What do you mean, he didn't do none of that?
"A. He did a terrible job of even trying to present it as such."

Bentley testified about his interview with Detective Weidner. Bentley admitted that he told Weidner he possessed the methamphetamine found on his person. Then the following exchange occurred:

"Q. Because of your statements that you gave to police, that the Court ruled were going to be admissible, where you admitted that you possessed the drugs and guns, the whole strategy of the case was trying to convince the jury that you were not dealing meth, correct?
"A. I believe that was his strategy, yes."

19

Trial counsel then testified that Bentley's case became more difficult after the district court denied his motion to suppress, which opened the door to the claim that Bentley possessed the drugs for distribution. He stated: "I think Mr. Bentley had been pretty consistent with me all along that this was personal use." Trial counsel said Bentley never denied he had the drugs from the outset of the case.

"Q. So from the outset he never denied to you that he had those drugs?
"A. No, no, he never denied that to me. I mean, it was—he was pretty consistent this was personal use, he wasn't dealing.
"Q. One of the other hurdles that you had to—you had in this was that the State had a presumption of intent to distribute based upon the amount?"
"A. Yes.
"Q. A rebuttable presumption, but a presumption nonetheless?
"A. Yes.
"Q. So all of that together made your focus and Mr. Bentley's focus on getting the jury to convict him of the lesser possession of methamphetamine?
"A. We—we had this long list of things that we worked off and we just—we tried to pound that to them over and over. I think we talked to them in all the phases of the trial, over and over, about all the reasons why they should believe Mr. Bentley was not engaged in the distribution of these narcotics.
"Q. This strategy, was that discussed prior to the trial?
"A. Yes."

The district court denied relief on the motion, finding that trial counsel's performance was not deficient. Moreover, the district court found there was no reasonable probability the jury would have reached a different result had trial counsel done anything differently.

Bentley relies on *McCoy v. Louisiana*, 584 U.S. ___, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018), as support for this claim. There, the United States Supreme Court discussed the role of an attorney when representing a client:

"Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' *Gonzalez v. United States,* 553 U.S. 242, 248, 128 S. Ct. 1765, 170 L. Ed. 2d 616 (2008) . . . . Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).

"Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." *McCoy*, 138 S. Ct. at 1508.

While the case supports the notion that a defendant has the authority to choose whether to admit or deny guilt, Bentley overlooks a key fact that differentiates that case from his own. First, McCoy "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." 138 S. Ct. at 1505. And in the first paragraph of the opinion, the Court stated:

"In *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial 'when [the] defendant, informed by counsel, neither consents nor objects,' id., at 178, 125 S. Ct. 551. In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. Id., at 186, 125 S. Ct. 551. We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor

21

protesting counsel's proposed concession strategy, id., at 181, 125 S. Ct. 551, '[no] blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy, id., at 192, 125 S. Ct. 551." *McCoy*, 138 S. Ct. at 1505.

Here, Bentley knew about the theory of defense. Trial counsel specifically stated that he discussed it with Bentley before trial. Indeed, Bentley did not express problems with the strategy so much as he believed trial counsel could have done a better job of presenting the theory to the jury. Bentley repeatedly stated to trial counsel that while he possessed the methamphetamine, and had admitted to the police that he had done so, he had no intent to distribute it. Nothing in the record suggests that Bentley vociferously argued against employing the strategy like the defendant in *McCoy*. See 138 S. Ct. at 1505.

Bentley also relies on *State v. Carter*, 270 Kan. 426, 14 P.3d 1138 (2000). There, the defendant, who had been convicted of first-degree murder and other crimes, argued on appeal that his trial counsel violated his rights under the Sixth Amendment to the United States Constitution by presenting a theory of defense inconsistent with his claim of innocence. Carter maintained his innocence throughout the trial, but his trial counsel's strategy directed the jurors toward a felony-murder conviction rather than a premeditated first-degree murder conviction. Trial counsel apparently employed that strategy because "[t]here was no defense evidence; the State's evidence placed Carter in the midst of the robbery and identified him as the person who shot and killed the victim." 270 Kan. at 429.

Our Supreme Court reversed Carter's conviction and granted him a new trial based on trial counsel's actions. In doing so, the court stated that it is solely the defendant's decision whether to enter a plea of guilty or not guilty; a decision trial counsel effectively disregarded by pursuing a guilt-based defense. "It is a fundamental constitutional right guaranteed to a defendant, and defense counsel's imposing a guilt-based defense against

22

Carter's wishes violated his Sixth Amendment right to counsel and denied him a fair trial." 270 Kan. at 441.

Bentley's case is distinguishable from *Carter* for the same reasons it is distinguishable from *McCoy*. Trial counsel discussed the theory of defense with Bentley before trial. During the hearing on Bentley's posttrial motion, he did not express any disagreement with this strategy. His criticism was that his trial counsel could have done a better job of presenting the theory to the jury. At no point during the hearing did Bentley state that he did not want counsel to proceed with a guilt-based defense in an effort to avoid a conviction on the more serious charge of possession with intent to distribute. The evidence does not show that trial counsel abandoned Bentley or took any actions against his wishes. Bentley has failed to establish that trial counsel's performance fell below an objective standard of reasonableness. See *Khalil-Alsalaami*, 313 Kan. at 485-86. The district court did not err in denying relief on Bentley's motion based on claimed ineffective assistance of trial counsel.

*The District Court's Failure to Instruct the Jury on a Lesser-Included Crime*

Bentley argues the district court erred when it failed to instruct the jury on lesser included offenses of possession of methamphetamine with intent to distribute for amounts less than 3.5 grams of methamphetamine.

Bentley acknowledges his failure to request lesser included instructions during trial. As a result, we apply the clearly erroneous standard. See K.S.A. 2020 Supp. 22-3414(3). Under this standard, we will reverse only if we are firmly convinced the jury would have reached a different verdict if lesser included instructions had been given. Bentley has the burden to show both error and prejudice. See *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

23

Under K.S.A. 2020 Supp. 21-5109(b)(1), a crime is a lesser included crime if it is a lesser degree of the same crime. The severity level of possession with intent to distribute methamphetamine is determined by the quantity of methamphetamine a defendant possessed:

- Less than 1 gram—level 4;
- 1 to less than 3.5 grams—level 3;
- 3.5 to less than 100 grams—level 2;
- 100 grams or more—level 1. See K.S.A. 2020 Supp. 21-5705(d)(3).

Bentley was convicted of a level 2 crime. Had he possessed a lesser amount of methamphetamine with intent to distribute, he would have committed a lesser included crime—either a level 3 crime or a level 4 crime, depending on the amount. Thus, the parties agree that instructions for possession of methamphetamine with intent to distribute lesser amounts of methamphetamine would have been legally appropriate because they would have been lesser degrees of the crime with which he was charged.

Here, the sole question is whether lesser included instructions would have been factually appropriate. To be factually appropriate, there must have been sufficient evidence, viewed in the light favoring Bentley, that would have supported giving such lesser included instructions. See *State v. Holley*, 313 Kan. 249, 255, 485 P.3d 614 (2021). Bentley argues such instructions would have been factually appropriate because the State did not present testimony about the amount of methamphetamine he planned to distribute.

The police found two baggies of methamphetamine on Bentley's person when he was searched—one weighing 7.13 grams and the other weighing 20.57 grams. Bentley told Detective Weidner he planned to use the methamphetamine from the smaller bag for his own personal use but that he planned to "break the house off" with the larger bag, which Weidner understood to mean that Bentley intended to give methamphetamine to

24

people in exchange for them providing him with a place to stay. Thus, this larger bag was sufficient in and of itself to support his conviction of a level 3 crime under K.S.A. 2020 Supp. 21-5705(d)(3)(C).

In *State v. Palmer*, No. 110,624, 2015 WL 802733 (Kan. App. 2015) (unpublished opinion), the police discovered over 10 grams of methamphetamine on Palmer's person after searching him during a traffic stop. On appeal, he argued that a lesser included instruction for possession with intent to distribute less than 3.5 grams of methamphetamine "would have been factually appropriate because there was some evidence that at least a portion of the methamphetamine found in his possession was for his personal use rather than for distribution." 2015 WL 802733, at *7. This court rejected the argument:

> "K.S.A. 2014 Supp. 21-5705 only requires proof of the quantity of a controlled substance found in a defendant's possession, not the quantity that the defendant may have intended to distribute. Because Palmer did not possess less than 3.5 grams of methamphetamine, lesser included instructions corresponding to severity levels 3 and 4 possession with intent to distribute methamphetamine were not factually appropriate." 2015 WL 802733, at *7.

We find *Palmer* to be persuasive. There was no need for the district court to instruct on lesser included forms of the crime of possession of methamphetamine with the intent to distribute. We find no error by the district court in instructing the jury on this issue.

*The Constitutionality of the Rebuttable Presumption of an Intent to Distribute Methamphetamine*

Under K.S.A. 2020 Supp. 21-5705(e)(2), "there shall be a rebuttable presumption of an intent to distribute if any person possesses . . . 3.5 grams or more of . . .

25

methamphetamine." Bentley argues that applying this statutory presumption to him in this case was an unconstitutional deprivation of his rights to due process.

Interpreting this statute is a matter of law over which we have unlimited review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021). Similarly, Bentley's constitutional challenge is an issue of law that calls for unlimited review. *State v. Bodine*, 313 Kan. 378, 396, 486 P.3d 551 (2021). Because Bentley did not raise this issue before the district court, we apply the clear error standard if it is appropriate for us to consider the matter at all. *Crosby*, 312 Kan. at 639. We ordinarily do not entertain constitutional challenges that were not raised below. But under a well-recognized exception we will do so here because Bentley asserts a claim that he was denied his fundamental right to due process. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

Here, in accordance with our Pattern Instructions of Kansas (PIK) Crim. 4th 57.022 (2013 Supp.), the court instructed the jury:

> "If you find the defendant possessed 3.5 grams or more of methamphetamine, you *may infer* that the defendant possessed with intent to distribute. You *may consider* the inference along with all the other evidence in the case. You *may accept or reject* it in determining whether the State has met the burden of proving the intent of the defendant. This burden never shifts to the defendant." (Emphasis added.)

We find particularly instructive the holding in *State v. Strong*, 61 Kan. App. 2d 31, 499 P.3d 481 (2021), *petition for rev. filed* October 12, 2021, in which the court distinguished between a permissive and a mandatory statutory presumption. "'A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.'" 61 Kan. App. 2d at 35 (quoting *Francis v. Franklin*, 471 U.S.

26

307, 314, 105 S. Ct. 1965, 85 L. Ed. 2d 344 [1985]). The court found the presumption to be permissive and constitutional, stating:

"We agree with the reasoning of another panel of this court that addressed the mandatory versus permissive presumption issue in the context of marijuana possession under K.S.A. 2014 Supp. 21-5705(e)(1). In *State v. Jimenez*, No. 111,659, 2015 WL 5036738 (Kan. App. 2015) (unpublished opinion), the panel held:

"'. . . [T]he presumption set forth in K.S.A. 2014 Supp. 21-5705(e)(1) is permissive in nature and merely suggests the existence of a relationship between a fact proved and a fact presumed. Permissive presumptions are rebuttable and do not require the jury to convict after the State has made a prima facie case. Notably, a permissive presumption affirmatively permits the jury to return a verdict in favor of the defendant even if the defendant fails to introduce any evidence.' 2015 WL 5036738, at *4.

"Although *Jimenez* dealt with possession of marijuana under K.S.A. 2014 Supp. 21-5705(e)(1) rather than methamphetamine under (e)(2), the relevant language of K.S.A. 2018 Supp. 21-5705(e)—'there shall be a rebuttable presumption of an intent to distribute'—remains the same if the defendant possesses a certain weight of the drug. This presumption is permissive in nature. See *State v. Haremza*, 213 Kan. 201, 203-04, 515 P.2d 1217 (1973) ('Statutory presumptions are ordinarily rebuttable. . . . [They do] not alter the ultimate burden of proof resting upon the prosecution.'). Unlike the mandatory presumptions discussed in *Francis*, 471 U.S. at 314, K.S.A. 2018 Supp. 21-5705(e) does not instruct the jury it must infer that the defendant intended to distribute the drug if the defendant possessed a certain amount. The State retains its burden of persuasion. Instead, the provision creates a permissive inference telling the jury it may infer intent to distribute if the State proves the defendant possessed the requisite weight of the drug. K.S.A. 2018 Supp. 21-5705(e) does not violate the Due Process Clause because this inference is one justified by reason and common sense. See 471 U.S. at 314-15. K.S.A. 2018 Supp. 21-5705(e) is facially constitutional." *Strong*, 61 Kan. App. 2d at 38.

The court in *Strong* went on to assess the legal appropriateness of the instruction given to the jury. The instruction given there—entitled Instruction 6—mirrors the instruction the district court gave to the jury here. See 61 Kan. App. 2d at 39-40. This court rejected that challenge as well, reasoning:

> "Instruction No. 6 fairly stated the law on K.S.A. 2018 Supp. 21-5705(e)(2)'s rebuttable presumption because it was based on the PIK and accurately informed the jury that a rebuttable presumption of intent to distribute exists under the law if a person possesses 3.5 grams or more of methamphetamine. See *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018) (Supreme Court strongly recommends use of PIK instructions). It also informed the jury it could choose to reject the evidentiary presumption. Because K.S.A. 2018 Supp. 21-5705(e)(2) creates a permissive presumption, not a mandatory one as Strong argues, the instruction accurately reflects the law. Moreover, the district court correctly instructed the jury that the burden to prove criminal intent always remained with the State and never shifted to Strong. Instruction No. 6 was legally appropriate." *Strong*, 61 Kan. App. 2d at 40-41.

Based on the foregoing analysis, we conclude that K.S.A. 2020 Supp. 21-5705(e)(2) is facially constitutional.

Bentley also contends that the district court erred in giving this instruction. We disagree. The instruction followed the appropriate PIK instruction. Our Supreme Court strongly recommends the use of our PIK instructions. *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018). The instruction accurately stated the law embodied in K.S.A. 2020 Supp. 21-5705(e)(2). It informed the jury of the presumption of intent to distribute based on possessing 3.5 grams or more of methamphetamine. It informed the jury that the presumption was permissive—"you may infer" and "[y]ou may accept or reject it"— rather than mandatory. The instruction affirmed the State's "burden of proving the intent of the defendant" which "never shifts to the defendant." We find no error in the district court giving this instruction.

*The Sufficiency of the Evidence to Support Bentley's Conviction of Driving with a Suspended or Canceled License*

Finally, Bentley contends the evidence was insufficient to convict him of driving while his license was suspended or canceled. In considering this claim, we review the evidence in the light favoring the State to determine whether a rational fact-finder could have found Bentley guilty beyond a reasonable doubt. In doing so, we do not reweigh the evidence, resolve conflicts in the evidence, or reweigh the credibility of the witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "[O]nly when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

When Officer Long approached Bentley's stopped vehicle, Bentley initially tried to identify himself by his Kansas Department of Corrections number. Long then asked Bentley for his driver's license. Bentley responded that he did not have one. Long then obtained Bentley's name and other information and relayed that information to Officer Inkelaar, who returned to his police car and ran the information through the Special Police Information Data Entry Retrieval (SPIDER) police database and learned that Bentley had two outstanding warrants and that his driver's license had been suspended.

To establish this crime the State had to prove that Bentley drove "a motor vehicle on any highway of this state at a time when such person's privilege so to do is canceled, suspended or revoked." K.S.A. 2020 Supp. 8-262(a)(1). Because K.S.A. 2020 Supp. 8-255(d) required the Division of Motor Vehicles to notify Bentley in writing that his license had been suspended, the State also had to prove that it mailed notification of the license suspension to Bentley. See *State v. Jones*, 231 Kan. 366, 368, 644 P.2d 464 (1982).

29

But in *State v. Campbell*, 24 Kan. App. 2d 553, 556, 948 P.2d 684 (1997), the court concluded that there was no need for the State to introduce evidence that the Division of Motor Vehicles had sent a notice of suspension to the defendant when the defendant admitted that he knew that his license had been suspended. When Campbell challenged the sufficiency of the evidence to support this conviction, this court held that the State's failure to present evidence of compliance with K.S.A. 1996 Supp. 8-255(d) did not preclude Campbell's conviction because the purpose of mailing the written notice was to establish the presumption that the licensee knew his license had been suspended. Thus, "[w]hen a defendant has actual knowledge that his or her license has been suspended, . . . the State is not required to present direct evidence that there has been compliance with K.S.A. 1996 Supp. 8-255(d) in a prosecution under K.S.A. 1996 Supp. 8-262." 24 Kan. App. 2d at 556; see also *State v. Hershberger*, 27 Kan. App. 2d 485, 495-96, 5 P.3d 1004 (2000).

Here, there is direct evidence from Bentley that he did not have a valid driver's license and that he knew it. He did not say that he had a license but had left it at home, or some other excuse for not displaying his driver's license. He simply stated that he did not have a license. The officer confirmed the accuracy of Bentley's statement when he found that the SPIDER police database reported that Bentley's driver's license was suspended. Under the holding in *Campbell*, and viewing the evidence in the light favoring the State, the prevailing party, we conclude that the State was not required to introduce evidence that written notice of the suspension had been sent to Bentley when he told the officer he knew his license was suspended. We find sufficient evidence to support this conviction.

Affirmed in part, reversed in part, and remanded with directions.

GARDNER, J., concurring: I agree with the majority opinion on all issues but the second. I concur with the majority opinion on that issue because it faithfully follows the relevant Kansas Supreme Court precedent of *State v. Johnson*, 310 Kan. 909, 453 P.3d 281 (2019). I write separately, however, to respectfully encourage the Kansas Supreme Court to reconsider its holding in *Johnson* that a district court errs by accepting a defendant's stipulation to one element of a crime without first getting defendant's separate jury trial waiver on the record. Bentley's case presents a common scenario—although he stipulated to one element of the crime, his not guilty plea remained intact, the prosecution still bore the burden to prove at trial each element of the charged crimes beyond a reasonable doubt, and the jury decided each count against him. In these routine circumstances, as the State contends, it strains reason to hold that a stipulation to one element amounts to a guilty plea requiring a jury trial waiver. See *State v. Harned*, 281 Kan. 1023, 1045, 135 P.3d 1169 (2006) ("A guilty plea admits all elements of the crime charged.").

*The Nature of a Stipulation to an Element*

A defendant's stipulation to a prior crime in a felon in possession case is encouraged by law. See *Old Chief v. United States*, 519 U.S. 172, 189-90, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997) (If a criminal defendant offers to stipulate to his or her felon status, the State and the district court *must* accept that stipulation, contrary to the general rule that the State may prove its case against the defendant "free from any defendant's option to stipulate the evidence away."). This is because this kind of a stipulation is for the defendant's benefit. See *State v. Lee*, 266 Kan. 804, 815, 977 P.2d 263 (1999) ("Unless there is a dispute over the status of the prior conviction . . . the admission of the type and nature of the prior crime can only prejudice the jury.").

A stipulation neither relieves the State from its burden of proving all elements of the crime to the jury, nor waives a defendant's right to a jury trial. Instead, it merely relieves the State from its duty to present evidence on the stipulated element of the crime. A stipulation is simply a "voluntary agreement between opposing parties concerning some relevant point." Black's Law Dictionary 1712 (11th ed. 2019). In other words, a stipulation tells the jury that both sides agree that a particular fact or facts are true. See *State v. Bogguess*, 293 Kan. 743, 745, 268 P.3d 481 (2012) (a defendant waives his right to contest the factual evidence in a stipulation). A defendant's affirmative stipulation to a specific factual element is the equivalent of a jury finding on that issue. *United States v. Sanchez*, 269 F.3d 1250, 1271 n.40 (11th Cir. 2001) (en banc), *abrogated in part on other grounds as recognized by United States v. Duncan*, 400 F.3d 1297, 1308 (11th Cir. 2005). A stipulation does not mean that the stipulated element is removed from the jury's consideration, as would occur with a jury trial waiver; rather a stipulation means that the jury must consider the stipulated element but should find it proven.

*Kansas Precedent Differs from* Johnson

Before *Johnson*, our Supreme Court squarely held that a district court need not get a jury trial waiver from a defendant before a defendant stipulates to an element during a jury trial. *White v. State*, 222 Kan. 709, 712-14, 568 P.2d 112 (1977). *Johnson* does not overrule, distinguish, or even mention *White*.

Yet *White*'s rationale is compelling:

"White entered a plea of not guilty, and thus he retained all of the rights of such a plea, including the right to appeal upon conviction. The duty of the trial court to advise him of the effects of a possible guilty plea terminated upon his entry of a plea of not guilty.
   "The mere fact that White stipulated as to the evidence did not amount to the entry of a plea of guilty. Stipulations between trial counsel even without the written consent of the parties are commonplace, and are binding upon the parties represented.

32

Stipulations as to the evidence in criminal cases, waiving jury trial and consenting to trial to the court, are permissible under our statutes. *State v. Kinnell*, 197 Kan. 456, 419 P.2d 870; and see *State v. Teeslink*, 177 Kan. 268, 278 P.2d 591.

"We know of no case or statute holding that a trial court must interrogate and advise a defendant, who is represented by counsel, before accepting and approving stipulations as to the evidence, and we are not prepared to initiate such a requirement." 222 Kan. at 713.

*White*'s holding also reflects our longstanding jurisprudence—apparently jettisoned by *Johnson*—that criminal defendants are charged with deciding only what plea to enter, whether to waive jury trial, and whether to testify, but all other decisions lie with defense counsel who is not required to specifically consult with the defendant first. *State v. Rivera*, 277 Kan. 109, 116-17, 83 P.3d 169 (2004); see *State v. Laturner*, 289 Kan. 727, 739, 218 P.3d 23 (2009) (the right of confrontation falls into the class of rights that defense counsel can waive through strategic decisions, such as by stipulating to the admission of evidence); *State v. Kinnell*, 197 Kan. 456, 461, 419 P.2d 870 (1966) (the accused may waive his right to cross-examination and confrontation and that waiver may be done by counsel as a matter of trial tactics or strategy). Based on *White*, we rejected the claim in a felon in possession case that defendant's stipulation to felon status required a knowing and voluntary jury trial waiver as to that element because it removed an element of the crime from the jury's consideration. See, e.g., *State v. Housworth*, No. 115,836, 2017 WL 2834502, at *15-16 (Kan. App. 2017) (unpublished opinion).

Johnson*'s Rationale and Holding is Unsupported by Law*

In *Johnson*, the court ignored *White* and cases such as those above, rejecting the State's assertion that a stipulation to an element of a crime did not amount to a guilty plea so it did not require a jury trial waiver. But *Johnson*'s reasoning was scant:

33

"The Fifth and Sixth Amendments to the United States Constitution 'entitle [] criminal defendant[s] to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."' *Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (citing *United States v. Gaudin*, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 [1995]). And when a defendant stipulates to an element of a crime, the defendant has effectively given up his or her right to a jury trial on that element. *United States v. Smith*, 472 F.3d 752, 753 (10th Cir. 2006) (quoting *United States v. Mason*, 85 F.3d 471, 472 [10th Cir. 1996]).

"We have consistently held that jury trial waivers 'should be strictly construed to ensure the defendant has every opportunity to receive a fair and impartial trial by jury.' See, e.g., *Beaman*, 295 Kan. at 858. And because every defendant has the fundamental right to a jury trial, courts cannot accept a jury trial waiver '"unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record."' *State v. Irving*, 216 Kan. 588, 589-90, 533 P.2d 1225 (1975) (noting that a waiver will not be presumed from a silent record)." 310 Kan. at 918-19.

Our Supreme Court then unanimously ruled, without further analysis, that accepting the stipulation to an element without a waiver was reversible error because it violated the defendant's right to jury trial. 310 Kan. at 918-19.

On remand, a panel of this court reversed the conviction and remanded for a new trial on this charge. *State v. Johnson*, No. 113,228, 2020 WL 2091067, at *9 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 897 (2020). As we are duty bound to do, our later cases have followed *Johnson*. See, e.g., *State v. Portillo-Ventura*, No. 122,229, 2022 WL 569362, at *10-11 (Kan. App. 2022) (unpublished opinion) (summarizing cases); *State v. Munoz*, No. 121,770, 2022 WL 129005, at *12 (Kan. App. 2022) (unpublished opinion).

34

*Federal Law Conflicts with* Johnson

For its essential finding, *Johnson* relied on *Mason* and *Smith*, but these cases fail to support *Johnson*'s conclusion. The United States prosecuted the criminal defendant in *Mason* under 18 U.S.C. § 922(g)—the felon in possession statute—and the parties stipulated that § 922(g)'s prior felony conviction and interstate commerce elements were met. At trial, the district court instructed the jury that because the parties had stipulated to those two § 922(g) elements, "the government need not offer proof as to these elements, and you should consider them proven by the government." 85 F.3d at 472. On appeal, the defendant argued that the district court erred by withholding the stipulated elements from the jury's consideration.

Finding no error in the district court's jury instruction, the Tenth Circuit reasoned:

"[T]he jury need not resolve the existence of an element when the parties have stipulated to the facts which establish that element. . . . [T]he judge has not removed the consideration of an issue from the jury; the parties have. More specifically, by stipulating to elemental facts, a defendant waives his right to a jury trial on that element. If such a partial waiver runs afoul of the Sixth Amendment, then traditional, wholesale waivers manifest in bench trials and guilty pleas must necessarily violate the right to a jury trial." 85 F.3d at 472-73.

Thus*, Mason* does not suggest that a defendant's stipulation to one element requires a jury trial waiver colloquy, as *Johnson* held. To the contrary, *Mason* held that "by stipulating to elemental facts, a defendant waives his right to a jury trial on that element." *Mason*, 85 F.3d at 472; see *United States v. Meade*, 175 F.3d 215, 223 (1st Cir. 1999); *United States v. Wittgenstein,* 163 F.3d 1164, 1169 (10th Cir. 1998) (same); *United States v. McBride*, 26 Fed. Appx. 785, 786 (10th Cir. 2001) (unpublished opinion) (same); see also *United States v. Prentiss*, 206 F.3d 960, 976 (10th Cir. 2000), *on reh'g en banc*, 256 F.3d 971 (10th Cir. 2001), *overruled on other grounds as recognized by United*

35

*States v. Langford*, 641 F.3d 1195 (10th Cir. 2011); *Poole v. United States*, 832 F.2d 561, 563 (11th Cir. 1987) (factual stipulations may waive the government's burden of proving an element of the offense and thus waive a defendant's right to a jury trial on that element of the offense). In other words, a stipulation to an element is itself a sufficient waiver of the right to a jury trial on that element. It does not require a separate jury trial waiver because an elemental stipulation preserves rather than waives a defendant's right to a jury trial.

Nor did *Smith* address the issue *Johnson* cited it for. Instead, *Smith* examined whether an insufficient evidence argument could succeed when the State had not read defendant's stipulation into evidence before it rested, but the court had included the stipulation as an instruction. *Smith* found the jury instruction sufficient:

> "But the very nature of a defendant's waiver is that it frees the government from the obligation to present *any* evidence regarding the element in question. Certainly the government must inform the jury of the defendant's stipulation at some point, in order to provide jurors with the information they need to convict under the statute. Yet the stipulation is not itself evidence; it is an admission—a waiver of the right to demand evidence." *United States v. Smith*, 472 F.3d 752, 753 (10th Cir. 2006).

*Smith* says nothing to support *Johnson*'s conclusion that a stipulation to an element amounts to a guilty plea requiring a separate jury trial waiver.

Federal law in general contradicts *Johnson*'s holding. Under federal law, a district court need not directly question the defendant about a factual stipulation and the court may accept it "so long as the defendant does not dissent from his attorney's decision." *Hawkins v. Hannigan*, 185 F.3d 1146, 1155 (10th Cir. 1999) (upholding evidentiary stipulation against Sixth Amendment challenge because no evidence showed that the defendant disagreed with or objected to his counsel's decision); cf. *United States v. Herndon*, 982 F.2d 1411, 1418 (10th Cir. 1992) (advising but not requiring a district

court to address defendant directly to ensure that the "stipulation is entered into voluntarily, that the defendant understands the stipulation, and that the stipulation has a factual basis").

Federal courts do not generally require Rule 11 warnings when a defendant stipulates to only an element of a crime. See Fed. R. Crim. Proc. 11 (requiring district courts to ensure that a defendant understands the rights attendant to a jury trial and that trial rights are waived if the court accepts a guilty plea). Under federal law, giving up one's right to a jury trial on an element of a crime does not constitute a guilty plea to all elements of the crime and is not a de facto guilty plea. See *United States v. Muse*, 83 F.3d 672, 681 (4th Cir. 1996) (rejecting as "meritless" defendant's argument that Rule 11 procedures were required when the court removed the stipulated elements from the jury's consideration because "the jury was still required to consider and return a verdict finding Muse guilty of all of the elements of the offense"); *United States v. Ferreboeuf*, 632 F.2d 832, 836 (9th Cir. 1980) (rejecting a rule requiring the trial judge to question defendants personally as to the voluntariness of any stipulation of crucial fact because that rule would needlessly delay and confuse the conduct of a typical trial); *United States v. Hicks*, 495 Fed. Appx. 633, 642-43 (6th Cir. 2012) (unpublished opinion) (defendant's stipulation to most elements of being a felon in possession of a firearm did not amount to a de facto guilty plea requiring evidence that defendant had entered into the stipulations voluntarily and knowingly); *United States v. Monghan*, 409 Fed. Appx. 872, 874-78 (6th Cir. 2011) (unpublished opinion) (stipulations did not amount to a de facto guilty plea and thus did not require evidence that defendant had entered into the stipulations voluntarily and knowingly); cf. *Smith v. Armontrout*, 692 F. Supp. 1079, 1086-87 (W.D. Mo. 1988), *aff'd* 888 F.2d 530 (8th Cir. 1989) (finding meritless the claim that the trial court's failure to conduct an on-the-record inquiry into petitioner's voluntary and intelligent consent to a stipulated admission violates petitioner's due process rights under the Fourteenth Amendment).

Contrary to *Johnson*'s holding, under federal law, only when a defendant stipulates to all the elements of an offense or otherwise reduces the government's burden so much that the stipulation amounts to a de facto guilty plea may a district court need to conduct a colloquy in compliance with the governing statutes. See *Julian v. United States*, 236 F.2d 155, 158 (6th Cir. 1956) (when defendant stipulated to felonious intent—the controlling issue in the case—the stipulations amounted to a plea of guilty, so the trial judge should have asked whether defendant understood the charge and voluntarily acquiesced in the stipulations); *Muse*, 83 F.3d at 681 ("although Muse stipulated to two of the elements, he vigorously contested the existence of the third, and most critical, element at trial," so his stipulations did not amount to a guilty plea and Rule 11 did not apply); *Monghan*, 409 Fed. Appx. at 875 (when a defendant "stipulates to all of the elements of an offense or otherwise so reduces the government's burden that the stipulation amounts to a de facto guilty plea, the district court should conduct a colloquy in compliance with Rule 11"); cf. *Owan v. Galaza*, No. 98-55580, 1998 WL 911882, at *2 (9th Cir. 1998) (unpublished opinion) ("[A] plea of not guilty in combination with a stipulated facts trial is simply not equivalent to a guilty plea for *Boykin* purposes, even if the stipulation is to all elements necessary to a conviction," so no waiver of rights is required before the admission of stipulated evidence.). See also 17 A.L.R. 4th 61 *Guilty plea safeguards as applicable to stipulation allegedly amounting to guilty plea in state criminal trial* (collecting state cases for and against the position that the trial judge must admonish the defendant as to his constitutional rights just as if the defendant pleaded guilty, when the defendant stipulates to evidence which in effect amounts to a guilty plea).

Bentley's stipulation does not meet the de facto guilty plea test—he did not stipulate to all the elements of the felon in possession charge or otherwise reduce the State's burden so much that his stipulation was somehow like a guilty plea. Instead, by his stipulation, Bentley waived only his right to make the State present evidence that he had a felony conviction within the last five years and was thus prohibited from possessing a

firearm on the date of his current crimes. And despite Bentley's stipulation to his felon status, he contested the critical criminal elements of his offense—that he possessed the firearms listed in Instructions 8 and 9 on the date and at the place stated. "In no way did [his] stipulation amount to a plea of guilty, and a colloquy was therefore not required." *Monghan*, 409 Fed. Appx. at 876.

*Alternatively, Harmless Error Applies*

But even if we assume, as *Johnson* did, that a stipulation to any element amounts to a de facto guilty plea and thus requires a jury trial waiver, we should apply the harmless error rule, rather than reverse the conviction, when a court fails to get a separate knowing and voluntary jury trial waiver on the record. In the analogous situation when the omission of an element from a jury instruction compromises a defendant's constitutional right to jury trial, we review that mistake for harmlessness. *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). The Kansas Supreme Court has so held: "When a reviewing court concludes beyond a reasonable doubt that the omitted element of a crime from a jury instruction was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *State v. Carr*, 314 Kan. 744, Syl. ¶ 12, 502 P.3d 511 (2022); see also *State v. Richardson*, 290 Kan. 176, 182-83, 224 P.3d 553 (2010).

Federal courts apply the harmless error rule in comparable situations. When a defendant fails to object to a Rule 11 error, federal courts review for plain error, not structural error. See *United States v. Denkins*, 367 F.3d 537, 545 (6th Cir. 2004) ("Because Defendant failed to object to this plea colloquy, we review [Defendant's claim that the district court did not adequately ensure that he understood the charges against him] only for plain error.") (citing *United States v. Vonn*, 535 U.S. 55, 59, 122 S. Ct. 1043, 152 L. Ed. 2d 90 [2002] [holding that plain-error review applies when a defendant

fails to object to a Rule 11 error]); *United States v. Keesee*, 275 Fed. Appx. 488, 492 (6th Cir. 2008) (unpublished opinion) ("Keesee made no reference to Rule 11 during the proceedings. . . . We engage in plain-error review of purported violations of Rule 11 when the defendant did not raise an objection before the district court.") (citing *United States v. Murdock*, 398 F.3d 491 [6th Cir. 2005]); *Monghan*, 409 Fed. Appx. at 875 ("Monghan did not object to the court's failure to question him about the stipulation. Accordingly, plain-error review applies.").

We should apply the harmless error analysis here. Although an uninformed waiver of one's right to an entire jury trial would automatically entitle the defendant to relief, an uninformed stipulation to a single element is reviewable for harmless error, just as if the district court had erroneously omitted that element from the jury instructions. See *State v. Brooks*, No. 113,636, 2017 WL 839793 (Kan. App. 2017) (unpublished opinion); cf. *Connecticut v. Johnson*, 460 U.S. 73, 87, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983) (finding jury instruction error in state trial involving an essential element of crime harmless error without implicating the Fifth and Sixth Amendments when defendant stipulated to facts establishing the essential element).

The harmless error test, as applied here, asks whether the record contains evidence that could rationally lead to a contrary finding on the omitted element—if not, no fundamental undermining of the right to a jury trial occurs.

> "A reviewing court making this harmless-error inquiry does not, as Justice Traynor put it, 'become in effect a second jury to determine whether the defendant is guilty.' Traynor, *supra,* at 21. Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.' *Rose*, 478 U.S., at 577. On the contrary, it 'serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of

having changed the result of the trial.' *Chapman,* 386 U.S., at 22." *Neder*, 527 U.S. at 19 (finding the District Court's failure to submit the element of materiality to the jury with respect to tax charges was harmless error).

In *Neder*, when a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering whether the jury verdict would have been the same without the error did not fundamentally undermine the purposes of the jury trial guarantee. 527 U.S. at 19.

Applying the harmless error test here yields the same result. The sole element Bentley stipulated to was the fact of his prior conviction. That Bentley had been convicted of a felony within the five years preceding his trial was based on objective facts that could easily be proven through disinterested witnesses. His stipulation was routine. Bentley stipulated to facts that were facially valid or easy to verify, so Bentley's lawyer correctly recognized them to be essentially uncontestable and as providing no suggestion of reasonable doubt. The stipulation, as the sole substantive information given to jurors about those facts, made proof of this element overwhelming and undisputed. The narrow factual issue covered in the stipulation would not have furnished even a colorable defense, as the decision to stipulate itself reflected. Those considerations together render any error harmless under the stringent standard required by *Neder* and *Carr.* Bentley could not contest that element with facts, so answering whether the jury verdict would have been the same without the error does not fundamentally undermine the purposes of the jury trial guarantee. See *Neder*, 527 U.S. at 19. Any violation of Bentley's rights to a jury trial is harmless error. See *Brooks*, 2017 WL 839793, at *9-10.

For those reasons, I respectfully ask the Kansas Supreme Court to revisit *Johnson*'s holding on this issue.